DISTRICT OF COLUMBIA, Appellant,

v.

OWENS–CORNING FIBERGLAS
CORPORATION, et al.,
Appellees.

No. 87–1254.

District of Columbia Court of Appeals.

Argued March 1, 1989.
Decided Aug. 24, 1989.
Rehearing Granted and Opinion
Modified March 8, 1990.
Rehearing En Banc Denied
March 8, 1990.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant.

Paul A. Zevnik, for appellee GAF Corp., with whom Andrew A. Cohen and L. Elise Dieterich, Washington, D.C., for appellee GAF Corp., and William S. Gardner, Thomas J. O'Brien, and Michel Y. Horton, Washington, D.C., for appellee U.S. Gypsum Co., were on the brief.

John F. Mahoney, Jr., Washington, D.C., entered an appearance for appellee Owens–Corning Fiberglas Corp.

Chris Russo entered an appearance for appellees Celotex Corp. and Carey Canada, Inc.

Richard McMillan, Jr., Washington, D.C., entered an appearance for appellee Eagle–Picher Industries.

Kevin McCormick entered an appearance for appellee Armstrong World Industries.

Quentin R. Corrie, Falls Church, Va., entered an appearance for appellee Keene Corp.

Edgar A. Sabanegh, Fairfax, Va., entered an appearance for appellee Fibreboard Corp.

Andre Jay Graham and Lee H. Ogburn, Baltimore, Md., entered appearances for appellees Southern Textile Corp. and H.K. Porter Co.

John G. Calender, Washington, D.C., entered an appearance for appellee Owens–Illinois, Inc.

Richard W. Boone, Arlington, Va., and Vicki J. Hunt, Rockville, Md., entered appearances for appellee CertainTeed Corp.

Edward J. Lopata, Baltimore, Md., and Dwight D. Murray, Washington, D.C., entered appearances for appellee W.R. Grace and Co.

John M. Bray and Charles B. Wayne, Washington, D.C., entered appearances for appellee Nat. Gypsum Co.

Patrick Mochu entered an appearance for appellee U.S. Mineral Products Co.

Charles R. Bruton, Philadelphia, Pa., and Shelley Spencer entered appearances for appellee Pfizer, Inc.

Theresa Hajost, Washington, D.C., entered an appearance for appellee Georgia–Pacific Corp.

Marianne Eby entered an appearance for appellee Proko Industries, Inc.

Steven D. Cundra and Rochelle Hindman, Washington, D.C., entered appearances for appellee Flintkote Co.

John B. Isbister and William W. Carrier, Baltimore, Md., entered appearances for appellee Raymark Industries, Inc.

Stephen A. Bogorad entered an appearance for appellee Pittsburgh Corning Corp.

Bradley B. Cavedo, Richmond, Va., entered an appearance for appellees Turner and Newall PLC, J.W. Roberts, Ltd., and Turner Asbestos Fibres, Ltd.

Kevin J. McCarthy and Charles E. Gallagher entered appearances for appellee Asbestos Corp., Ltd.

Before MACK, BELSON and TERRY, Associate Judges.

MACK, Associate Judge:

The District of Columbia brought suit, sounding in tort, against thirty-seven miners, manufacturers, sellers and distributors of asbestos, a toxic substance until recently in common use in building construction, to recover removal costs and other damages associated with asbestos installation in roughly 2400 public buildings, including schools, libraries, hospitals, government offices, and public housing. The trial court granted summary judgment as to about eighty percent (80%) of the claims, holding them to be barred by the then-effective statute of limitations, D.C.Code § 12–301 (1981),[1] and statute of repose on building

---

1. D.C.Code § 12–301 was later amended by D.C.Law 6–202, 34 D.C.Reg. 527, 1885 (1987), *infra* note 3. Prior to amendment, it read in relevant part as follows:

§ 12–301. *Limitation of time for bringing actions.*

Except as otherwise specifically provided by law, actions for the following purposes may

improvements, D.C.Code § 12–310 (1981).[2] The District contended, and contends on appeal, that it enjoys sovereign or municipal immunity from the running of the statutes of limitations and repose, particularly when suing in its governmental capacity to protect public safety or health.

Notwithstanding this contention, while the case was still pending, the Council of the District of Columbia passed legislation, D.C.Law 6–202,[3] specifically exempting the District from these provisions. By its terms, the law applied retroactively to all cases pending as of July 1, 1986, and therefore to the instant case. However, as the legislation awaited expiration of the thirty-day congressional approval period before becoming effective, the trial court entered an order dismissing the claims now on appeal.

Before this court, the District argues that it enjoyed sovereign immunity by virtue of common law, or, in the alternative, by the effect of statute. Appellees contest both arguments. They argue that the District is a municipality unentitled to any of

---

not be brought after the expiration of the period specified below from the time the right to maintain the action accrues:

\* \* \* \* \* \*

(8) for which a limitation is not otherwise specially prescribed—3 years. . . .

2. D.C.Code § 12–310, also later modified by D.C.Law 6–202, infra note 3, read, prior to its amendment, as follows:

§ 12–310. Actions arising out of death or injury caused by defective or unsafe improvements to real property.

(a)(1) Except as provided in subsection (b), any action—

(A) to recover damages for—

(i) personal injury,

(ii) injury to real or personal property, or

(iii) wrongful death, resulting from the defective or unsafe condition of an improvement to real property, and

(B) for contribution or indemnity which is brought as a result of such injury or death, shall be barred unless in the case where injury is the basis of such action, such injury occurs within the ten-year period beginning on the date the improvement was substantially completed, or in the case where death is the basis of such action, either such death or the injury resulting in such death occurs within such ten-year period.

(2) For purposes of this subsection, an improvement to real property shall be considered substantially completed when—

(A) it is first used, or

(B) it is first available for use after having been completed in accordance with the contract or agreement covering the improvement including any agreed changes to the contract or agreement whichever occurs first.

(b) The limitation of actions prescribed in subsection

(a) shall not apply to—

(1) any action based on a contract, express or implied, or (2) any action brought against the person who, at the time the defective or unsafe condition of the improvement to real property caused injury or death, was the owner of or in actual possession or control of such real property.

3. 34 D.C.Reg. 527, 1885 (1987) (codified at D.C. Code §§ 12–301, 12–310 (1989)).

D.C.Law 6–202 amends D.C.Code § 12–301 by (1) extending the statute of limitations "for the recovery of damages for an injury to real property from toxic substances including products containing asbestos" to "5 years from the date the injury is discovered or with reasonable diligence should have been discovered"; and (2) exempting the District of Columbia from application of the statute. It amends D.C.Code § 12–310(b) by adding subsections (3) and (4), which, respectively, prevent the statute of repose from applying to "any manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property" and "any action brought by the District of Columbia government." Finally, it adds section 12–311 to the D.C.Code, which reads:

§ 12–311. *Actions arising out of death or injury caused by exposure to asbestos.*

(a) In any civil action for injury or illness based upon exposure to asbestos, the time for the commencement of the action shall be the later of the following:

(1) Within one year after the date the plaintiff first suffered disability; or

(2) Within one year after the date the plaintiff either knew, or through the exercise of reasonable diligence should have known, that the disability was caused or contributed to by the exposure.

(b) "Disability" as used in subsection (a) of this section means the loss of time from work as a result of the exposure that precludes the performance of the employee's regular occupation.

(c) In an action for wrongful death of any plaintiff's decedent, based upon exposure to asbestos, the time for commencement of an action shall be the later of the following:

(1) Within one year from the date of the death of the plaintiff's decedent; or

(2) Within one year from the date the plaintiff first knew, or through the exercise of reasonable diligence should have known, that the death was caused or contributed to by the exposure.

the incidents of sovereignty, and renew their contention that the retroactive legislation, passed for the very purpose of curing the District's defective immunity, violated due process principles and the separation of powers.

We conclude that the District of Columbia enjoys a common-law municipal immunity from the effects of the statutes of limitations and repose when suing in its municipal capacity to vindicate public rights. Because this ruling is adequate to reinstate the claims dismissed by the trial court, we find it unnecessary to reach issues relating to the constitutional validity of D.C.Law 6–202.[4] We begin our analysis with a more detailed review of the nature of this litigation, including the interests at stake and procedural posture of the case. We then proceed to the merits.

## I. BACKGROUND

### A. *The Asbestos Hazard and Its Public Health Consequences*[5]

"Asbestos" is the generic term for a group of naturally occurring hydrated magnesium or calcium silicate fibers consisting of "long, thin, rock crystals formed from old rock by metamorphism" and obtained by mining. H. POLLACK, MATERIALS SCIENCE AND METALLURGY 417 (3d ed.1981); 4 L. GORDY & R. GRAY, ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 134A.30 (3d ed.1988). Because its long fibers can be dissolved, bonded, compacted, or spun into fire-, heat- and chemical-resistant materials, asbestos is easily manufactured into automobile linings, aircraft air ducts, fireproof gloves and clothing, insulating board, fireproof cloth, shingles, tiles, siding and pipe covering. H. POLLACK, *supra*, at 417. Under pressure, it may be molded with cement to produce asbestos board, or combined with sodium silicate to make thin paper sheets, useful to protect pipes, gaskets, and electrical wiring from fire or heat. *Id.* at 417–18. It may be bound with rubber to package chemicals, or with clay to insulate against high voltage. *Id.* at 418. Since the nineteenth century asbestos has also been widely used to insulate boilers, turbines, ovens, kilns, and other high-temperature equipment. P. BRODEUR, OUTRAGEOUS MISCONDUCT: THE ASBESTOS INDUSTRY ON TRIAL 11 (1985).

Because of its protective qualities and its versatility, asbestos has long been in wide use in a variety of settings. Consequently, large numbers of people have lived with, worked with, and been exposed to environments containing, asbestos. It has been incorporated into manufactured products such as protective clothing, containers and heavy equipment, and it has been used extensively as a fire-retardant in building construction. H. POLLACK, *supra*, at 417–18; L. GORDY & R. GRAY, *supra*, ¶¶ 134A.30, 134A.31. In efforts to prevent tragedies, builders have used asbestos in public facilities housing large numbers of workers, residents, visitors and other occupants, such as schools, hospitals, offices, and large-scale housing. *See* P. BRODEUR, *supra*, at 324. Further, hundreds of thousands of workers in the mining and manufacturing industries have worked directly with raw asbestos and asbestos products, exposing themselves unwittingly to extraordinary health hazards. *See generally id.; see* L. WHITE, HUMAN DEBRIS: THE INJURED WORKER IN AMERICA 15 (1983); W. HAMMER, OCCUPATIONAL SAFETY MANAGEMENT AND ENGINEERING 406 (3d ed. 1985).

The nature of these hazards has long been known. Greek and Roman chroni-

---

**4.** We note, of course, notwithstanding any dispute about the constitutionality of D.C.Law 6–202 as retroactively applied, there appears to be no constitutional defect in its prospective application. Thus it is unlikely that the issue we decline to decide here will arise, respecting this law, in any future case.

**5.** We stress that the reference to the sources herein and any reliance on the conclusions drawn thereby, are advanced in support of our holding that the District has brought this lawsuit in the objectively good faith belief that it is necessary to vindicate a public right and not to express or intimate any opinion as to the hazard posed by the particular asbestos products at issue in this litigation. Obviously, the latter question is to be resolved at trial uninfluenced by anything that this court has stated in addressing the preliminary issue of the timeliness of the suit.

clers observed a sickness of the lungs in slaves who wove asbestos fabric. P. BROD-EUR, *supra*, at 10. Modern knowledge of asbestos-related diseases dates back at least to the turn of the century, when Dr. H. Montague Murray, a British physician, discovered, in the autopsy of an asbestos textile worker, that the patient had suffered from severe pulmonary fibrosis, a degenerative disease of the lung tissue, and linked that condition to asbestos spicules found in the patient's lungs. *Id.* at 11. Since then, an increasing flow of medical literature has documented the incidence of lung diseases associated with exposure to asbestos.[6] Asbestos is highly friable, and upon disintegration, its particles float freely in the air, dusting skin and garments, and thus come to be handled and inhaled. Penetration of the skin can cause "asbestos warts." 4 L. GORDY & R. GRAY, *supra*, ¶ 134A.33. Much more serious diseases result from inhalation, including cancer of the lungs, bronchi, stomach and intestines; mesothelioma, a cancer of the chest wall (pleural mesothelioma) or abdominal cavity (peritoneal mesothelioma); and asbestosis, a fatally degenerative disease of the lung tissue involving heavy internal scarring.[7] *Id.*, ¶ 134A.34. Asbestos exposure is known to increase the risk of lung cancer five-fold, and in combination with heavy smoking, can multiply that risk 87 times. *Id.*, ¶ 134A.34(3). Studies have shown that 40% to 53% of insulation and shipyard workers with substantial exposure to asbestos have died of asbestos-related diseases. *See* L. WHITE, *supra*, at 15.

In a seminal study, the incidence of asbestosis in workers ten years after their first exposure was 10.4%; twenty years after, 44.1%; and forty years after, 94.2%. Selikoff, Churg & Hammond, *The Occurence of Asbestosis Among Industrial Workers*, 132 ANN. NEW YORK ACAD. SCI. 139, 147 (1965).

It is impossible to appreciate fully the social costs of these diseases without approaching their most distinctive feature: asbestosis, mesotheliomas and other asbestos-related cancers can result from relatively minimal exposure in a variety of environments, and do not begin to appear until long after the exposure itself occurs.

> It has been found that persons who have been subjected to otherwise comparatively minor exposures can be affected. Workers employed for only a few days at plants where asbestos is used or even handled, although they did not process it, have been afflicted. Workers have inadvertently carried asbestos on their clothing to their families at home where members have sickened and died.

W. HAMMER, *supra*, at 406. "In the mind of the public, this is the most worrying and unsettling fact—have I already been exposed to a chemical that will kill me in 10 years time? The scientific community has no answer to this emotive question." H. CRONE, CHEMICALS AND SOCIETY: A GUIDE TO THE CHEMICAL AGE 169 (1986).

This impact has also been felt by industry and government. Litigation by those afflicted with asbestos-related diseases

---

6. *See, e.g.,* Selikoff, Bader, Bader, Churg & Hammond, *Asbestosis and Neoplasia*, 42 AM.J. MED. 487 (1967); Dreessen, *A Study of Asbestosis in the Asbestos Textile Industry*, PUB.HEALTH BULL. No. 241 (U.S.Pub.Health Serv.1938); Lanza, *Asbestosis*, 106 J.A.M.A. 368 (1936); Ellman, *Pneumoconiosis*, 14 BRIT.J.RADIOL. 361 (1934); Cooke, *Pulmonary Asbestosis*, 2 BRIT.MED.J. 1024 (1927); Cooke, *Fibrosis of the Lungs Due to the Inhalation of Asbestos Dust*, 2 BRIT.MED.J. 147 (1924).

7. Sufferers of mesothelioma first experience pain at the site of the lesion, and may later develop a cough, calcification in the lungs, clubbing of the feet, increased girth, diminished appetite, anorexia, fluid retention in the abdominal cavity, thickening of the chest wall, and other symptoms. *Id.,* ¶ 134A.34(2). Mesothelio-mas only begin to appear fifteen or twenty years after the patient's first exposure to asbestos, are seen in greatest profusion ten years later, and are typically fatal within no more than two years of diagnosis. *Id.*

Asbestosis, a noncarcinomatous disease, is nevertheless fatal. Symptoms usually do not begin to appear until some fifteen years after exposure, when the patient begins to experience difficulty breathing after light exertion. *Id.,* ¶ 134A.34(1). As the disease advances, the sufferer develops heart enlargement, anorexia, clubbing of the fingers, reduced lung elasticity and vital capacity, hyperventilation, and degeneration of the bronchi, among other symptoms. *Id.;* W. HAMMER, *supra*, at 406. Eventually, any physical exertion becomes "painful and exhausting." *See* L. WHITE, *supra*, at 46.

reached a watershed with the first major tort recovery, *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir. 1973), and has already prompted the largest manufacturer, the Johns–Manville Corporation, to seek Chapter 11 bankruptcy protection from an estimated 50,000 tort claimants seeking more than $2 billion. *In re Johns–Manville Corp.*, 26 B.R. 420 (S.D. N.Y.1983); *see generally* Comment, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings*, 96 HARV.L.REV. 1121 (1983). Massive litigation has proceeded in many forums. The government has responded by designating asbestos a hazardous air pollutant[8] and enacting extensive consumer product, occupational, and environmental regulations.[9]

It is evident that environmental contamination by asbestos poses a pervasive and lethal threat to public safety.

### B. *Facts and Posture of this Litigation*

The District of Columbia initiated this suit on December 14, 1984, for damages resulting from the presence or suspected presence of asbestos-containing materials in 2407 properties on the master list of District-owned buildings. Having already expended some $4,401,793 on building inspection, the District reported in September 1986 that asbestos or asbestos-containing materials had been found in 17 of 20 public libraries and 171 of 188 public schools. Moreover, the District had contracted for further inspections which were planned or in progress at the 29 buildings of the District of Columbia General Hospital, 1181 buildings administered by the Department of Public Housing and Community Services, and 855 buildings administered by the Department of Public Works. Other structures affected included those belonging to the Fire Department and the Department of Corrections.

At the time the complaint was filed, the extent of the contamination was still not fully known. In an inspection of visible surfaces, five public schools were suspected of asbestos contamination as early as 1977, and were cleaned up or otherwise made safe at the District's expense by December 1980. Techniques ranged from actual removal to encasing or covering up building components incorporating asbestos-containing materials. More discoveries ensued; asbestos was found in particularly dangerous places, such as ventilation ducts, air conditioning systems, and exposed surfaces. The District has compiled a limited record of asbestos inspection, abatement and removal. It has used its own funds and those appropriated by Congress to survey buildings and has appointed a special task force to accomplish the undertaking. It has used existing agencies, such as the Department of Environmental Services and the Public Schools Division of Safety and Security, to carry the task forward. Finally, as it has become aware that the scope of the problem is larger than its own instrumentalities can handle, it has contracted with private firms to conduct comprehensive environmental testing. However, limited public resources have made the prompt, comprehensive investigation and cleanup of the District's buildings impracticable. Building records reportedly fill 855 boxes containing 2500 pages apiece. Moreover, these records do not always reflect repairs, alterations, equipment replace-

---

**8.** *See* 40 C.F.R. § 61.01(a) (1988); 36 Fed.Reg. 5931 (1971).

**9.** *See* 16 C.F.R. § 1145.4 (1988) (placing consumer patching compounds containing respirable free-form asbestos within regulatory scope of Consumer Product Safety Act); 16 C.F.R. § 1145.5 (1988) (placing emberizing materials containing respirable free-form asbestos within scope of Consumer Product Safety Act); 16 C.F.R. §§ 1304.1–1304.5 (1988) (banning consumer patching compounds containing respirable free-form asbestos); 29 C.F.R. § 1910.1001 (1988) (establishing occupational safety standards relating to exposure to asbestos and other toxic substances); 29 C.F.R. § 1910.1101 (1988) (establishing interim standards regarding occupational exposure to asbestos until effective date of 29 C.F.R. § 1910.1001); 40 C.F.R. §§ 61.140–61.156 (1988) (establishing national emission standards for asbestos); 40 C.F.R. §§ 427.10–427.116 (1988) (limiting asbestos effluence from production of asbestos products); 40 C.F.R. §§ 763.91, 763.99 & App. B (1988) (providing for removal of asbestos-containing materials from schools).

ments, or maintenance performed since construction. The mere survey of paperwork was expected to exceed a year in duration.

In the trial court, appellees contended that the District of Columbia long knew or should have known of the hazards underlying the litigation, and had even expended resources to remedy them. They argued that the statute of limitations barred any claim that the District failed to pursue within three years of discovering the hazard. Further, they contended that the statute of repose, barring any action to recover damages for injuries that occurred more than ten years after an improvement to real property and resulted from the defective or unsafe condition of the improvement, considered together with the three-year statute of limitations from the date a cause of action accrues, barred any claim resulting from improvements substantially completed before December 14, 1971—exactly thirteen years before the suit was filed. Accordingly, appellees jointly moved for orders of partial summary judgment as to claims allegedly barred by the statutes of limitations and repose.[10] The trial court granted these motions in part. It held that the statute of limitations and statute of repose applied to the District of Columbia "notwithstanding the suit's obvious public interest." *District of Columbia v. Owens–Corning Fiberglas Corp.*, 115 D.Wash.L. Rptr. 1905, 1911 (Sept. 11, 1987). The effect of its orders was to eliminate some 1958 buildings from the scope of this litigation, better than 80% of the District's claims. The District's application for allowance of an interlocutory appeal under D.C.Code § 11–721(d) (1981) was granted by this court.

## II. THE DISTRICT'S CLAIM OF IMMUNITY FROM THE STATUTES OF LIMITATIONS AND REPOSE

### A. *Introduction*

Unlike many other asbestos and toxic tort suits, the claims on appeal were not brought by an injured individual claimant or class, but by a government instrumentality seeking damages for the cost of preventing injury to others. This raises the distinct issue, not usually addressed in toxic tort cases, of a government's legitimate role in protecting the public, and the propriety of characterizing government spending on its own property as either a public or a private function. Here, however, it also raises the more immediate question whether the District government, because or in spite of its unique legal status, is entitled to a privilege accorded state governments but not ordinary litigants: immunity from the passage of time.

The District asserts that it enjoys sovereign immunity from the statute of limitations and statute of repose under a common-law principle called *nullum tempus occurrit regi* ("no time runs against the sovereign"). This doctrine has sometimes been invoked to defend the propriety of actions commenced by a state after a statute of limitations would ordinarily have run.[11] The District of Columbia, however, has never been admitted to the Union as a state. The District is, of course, a distinct jurisdiction and a governmental entity. For relevant purposes, it has been variously compared to or described as a state, territory, or municipality, and sometimes it has simply been called "unique."[12] Our

10. Appellees also moved for and obtained summary judgment on a claim for breach of warranty. The order granting summary judgment on the breach of warranty claim has not been appealed.

11. *See, e.g., Twin City Fire Ins. Co. v. Bell*, 232 Kan. 813, 658 P.2d 1038 (1983); *Todd v. State*, 474 So.2d 430 (La.1985); *Washington Suburban Sanitary Comm'n v. Pride Homes, Inc.*, 291 Md. 537, 435 A.2d 796 (1981); *Port Auth. of N.Y. & N.J. v. Bosco*, 193 N.J.Super. 696, 475 A.2d 676 (1984); *State v. Tidmore*, 674 P.2d 14 (Okla. 1983); *Comm'r v. Rockland Constr. Co.*, 498 Pa.

531, 448 A.2d 1047 (1982); *Waller v. Sanchez*, 618 S.W.2d 407 (Tex.Civ.App.1981).

12. *See Palmore v. United States*, 411 U.S. 389, 395–96, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342 (1973) (District is a state for diversity purposes and its courts are treated as state courts, but its laws are not state laws); *Kawananakoa v. Polyblank*, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907) (status of District comparable to that of a territory); *Metropolitan R.R. Co. v. District of Columbia*, 132 U.S. 1, 9, 10 S.Ct. 19, 22, 33 L.Ed. 231 (1889) (District is "a separate political community," a municipality, and a

question, therefore, is whether the government of the District is entitled to immunity in any of these capacities. We eschew deciding broader questions about the District's status because, following other jurisdictions, we are satisfied that it is entitled to limited immunity in its municipal capacity. This immunity encompasses the claims now on appeal. We therefore reach only the existence of the immunity and its applicability to the institutions bringing suit.

### B. *The Doctrine of* Nullum Tempus *and Sovereign Immunity*

It is well settled that sovereigns enjoy a common-law immunity from the operation of statutes of limitations and repose. *See Guaranty Trust Co. v. United States*, 304 U.S. 126, 132, 58 S.Ct. 785, 788–89, 82 L.Ed. 1224 (1938). Like immunity from suit, the sovereign exemption from the running of time originated as a royal privilege, *id.*, and perhaps survived the Revolution more by force of habit or precedent than by reason. *See United States v. Lee*, 106 U.S. 196, 207, 1 S.Ct. 240, 249, 27 L.Ed. 171 (1882);[13] 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 25.01, at 436–37 (1958). Nevertheless, it was long and creditably argued, at least regarding sovereign immunity from suit, that the law could not be invoked against the lawgiver, and consequently, the privilege continued in the states. *Kawananakoa, supra* note 11, 205 U.S. at 353, 27 S.Ct. at 527 (Holmes, J.).[14] Ultimately, it seems, the lone explanation of historical prerogative was unsatisfactory, perhaps because, in arbitrary fashion, it seemed to give the government a right that was withheld from the people. Especially as the legislatures and courts began limiting the scope of sovereign immunity from suit,[15] a more plausible justification for the parallel doctrine of *nullum tempus* seemed necessary if immunity from the effect of time was to continue. Therefore the Supreme Court explained in *Guaranty Trust, supra,* 304 U.S. at 132, 58 S.Ct. at 788–89, that the rule expresses a legitimate public policy of preserving "public rights, revenues, and property from injury or loss, by the negligence of public officers. And although this is sometimes called a prerogative right, it is in fact nothing more than a reservation, or exception, introduced for the public benefit, and equally applicable to all governments." *Id.* (quoting *United States v. Hoar*, 26 Fed.Cas. 329, 330 (C.C. D.Mass.1821) (No. 15,373)). Thus, the policy of protecting the lawgiver was reunited with more democratic principles, for it was recognized that the people, as sovereign, are entitled to immunity from government functionaries' lax prosecution of public rights. *Id.*[16] The inherent limitation of this doctrine, of course, is that the rights protected must be of a public nature, and not merely the private or proprietary interests of particular institutions. *See District of Columbia v. Weiss*, 263 A.2d 638, 639 (D.C.1970); *Stonewall Construction Co. v. McLaughlin*, 151 A.2d 535, 536 (D.C.1959).

■ There is substantial authority for the application of the *nullum tempus* doctrine to actions brought by state government authorities. *See supra* note 10. The existence of the doctrine is not, and cannot

---

state only in a qualified, non-constitutional sense); *Firemen's Ins. Co. of Washington, D.C. v. Washington*, 157 U.S.App.D.C. 320, 325, 483 F.2d 1323, 1328 (1973) (District is "a unique entity," "more akin to a state than to a municipality").

**13.** The *Lee* Court observed that although sovereign immunity had "repeatedly been asserted here, the principle [had] never been discussed or the reasons for it given, but it [had] always been treated as an established doctrine." *Id.*

**14.** The *Kawananakoa* Court said, "[T]he answer has been public property since before the days of Hobbes.... [T]here can be no legal right as against the authority that makes the law on which the right depends." *Id.*

**15.** *See, e.g.,* Federal Tort Claims Act, ch. 753, 60 Stat. 812 (1946) (codified as amended at 28 U.S.C. §§ 1291, 1346, 1402, 2110, 2411–12, 2671–80 (1982 & Supp. IV 1986)); *Gray v. Bell*, 229 U.S.App.D.C. 176, 712 F.2d 490 (1983).

**16.** As the Supreme Court explained in *Guaranty Trust*, "Regardless of the form of government and independently of the royal prerogative once thought sufficient to justify it, the rule is supportable now because its benefit and advantage extend to every citizen...." 304 U.S. at 132, 58 S.Ct. at 789.

be, in issue. Rather, the applicability of the doctrine to municipalities, and to the District of Columbia in particular, are debated in this case. The dispute boils down to a perceived conflict between the Supreme Court's disposition in *Metropolitan Railroad, supra* note 11, 132 U.S. at 22, 10 S.Ct. at 20, and our own holdings in *Weiss, supra,* and *Stonewall Construction, supra.* In *Metropolitan Railroad* the District of Columbia sued a private company, which was under congressional charter to provide local transit service in the District and maintain the pavement adjacent to its trackbeds, for damages in the amount the District had expended to repair pavements defendant had failed to maintain. 132 U.S. at 2, 10 S.Ct. at 20. The Court held the District's suit barred by the statute of limitations, reasoning that the District was "a municipal body merely," *id.* at 3, 10 S.Ct. at 20, having a right to sue and be sued according to the ordinary rules governing suits between private parties. *Id.* at 9, 10 S.Ct. at 22. The Court further held that the sovereign power of the District was lodged in the federal government, not the District corporation. *Id.* Significantly, however, the Court reserved judgment as to whether a municipality could be time-barred from asserting a right where the alleged offense infringed on the sovereign power itself, and where the municipality had acquired a right in the interest protected by that sovereign power. *Id.* at 11, 10 S.Ct. at 23. The Court explained:

> What may be the rule in regard to purprestures [wrongful enclosures of public spaces by private parties] and public nuisances, by encroachments on the highways and other public places, it is not necessary to determine. They are generally offenses against the sovereign power itself, and, as such, no length of time can protect them.
>
> Where the right of property in such places is vested in the municipality, an assertion of that right may or may not be subject to the law of limitations. We express no opinion on that point, since it

may be affected by considerations which are not involved in the present case.

*Id.* Thus, the Court intimated that the right asserted in *Metropolitan Railroad* was not inherently sovereign, and that the District, being a municipality, lacked intrinsic sovereignty. However, it left open the question whether the District might be protected by *nullum tempus* when it did acquire a right to protect an intrinsically sovereign interest or when exercising any right which is peculiarly that of a sovereign. As discussed further below, we conclude that the immunities asserted by the District in this case are distinct from those asserted in *Metropolitan Railroad* in that they are not claimed as sovereign or quasi-sovereign privileges belonging intrinsically to the District government, but rather, solely in connection with public functions delegated to it to be performed in the posture of a municipality.

Facially, our decisions in *Weiss* and *Stonewall Construction* appear to contradict the Supreme Court's holding in *Metropolitan Railroad.* In *Weiss, supra,* 263 A.2d at 639-40, an action the District brought to compel appellee to pay for services at a public hospital, we held that the District could not be time-barred from asserting a public right. Similarly, in *Stonewall Construction, supra,* 151 A.2d at 536, an action brought by the District of Columbia Unemployment Compensation Board to recover unpaid compulsory unemployment contributions, we held that the Board's action was not barred by the statute of limitations because it asserted a public right. Appellees argue that *Metropolitan Railroad* renders *Weiss* invalid, and, citing dictum in *Ward v. District of Columbia,* 494 A.2d 666, 668 n. 1 (D.C.1985), that *Stonewall Construction* is inapposite because in it "the sovereignty of Congress—not that of the District of Columbia—blocked application of the statute." *Id.* The latter argument begs the question. All authority exercised by the District government is derived from congressional mandate.[17]

---

**17.** *See* U.S. Const., Art. I, § 8, cl. 17; District of Columbia Self–Government and Governmental Reorganization Act ("Home Rule Act"), Pub.L.

No. 93–198, 87 Stat. 774 (1973) (codified as amended in scattered sections of Titles 2, 5, 29,

The issue is therefore not whether the relevant power belongs to the District or to Congress, but whether a municipality may wield a congressionally mandated power subject to the protections ordinarily accorded the wielder of that power. This is the crux of the question that the Supreme Court left open in *Metropolitan Railroad.* It is in this legal context that we must examine whether the exercise of a particular power is subject to time-bars or exempt from them.

We conclude that in initiating law suits like the one before us, the District enjoys municipal immunity from the running of time. To this day, the District is legally organized as a municipal corporation. D.C. Code § 1–102 (1987 Repl.). There is, of course, a significant distinction between legislative and municipal powers. The authority that the Constitution grants Congress over the District is unlike any other Article I power, however, in that it necessarily includes state or municipal functions.[18] An objective reading of the Home Rule Act demonstrates that Congress has delegated at least these municipal functions, as well as significant legislative authority, to the District.[19] This delegation includes the authority to perform public functions, such as providing for public health and safety.[20] Nevertheless, there is no need for us to decide that the District has all the sovereignty of a state to conclude that it enjoys the protection of the *nullum tempus* doctrine. There is considerable authority in other jurisdictions that when a municipality performs a public function, it enjoys legal immunity from the running of time.[21] We acknowledge that contrary authority exists,[22] but it is clear

31 & 40 U.S.C. (1982 & Supp. IV 1986); D.C. Code §§ 1–201–1–299.7 (1987 Repl.)).

**18.** *See Firemen's Ins. Co., supra* note 11, 157 U.S.App.D.C. at 324–25, 483 F.2d at 1327–28; Note, *Federal and Local Jurisdiction in the District of Columbia,* 92 Yale L.J. 292, 297–300 (1982).

**19.** *See Firemen's Ins. Co., supra* note 11, 157 U.S.App.D.C. at 325, 483 F.2d at 1328 ("When Congress delegates its police power to the local government, that entity's powers become as broad as those of Congress, limited only by the Constitution or specific Congressional enactment.").

**20.** Appellees do not contend that the delegation of power embodied in the Home Rule Act was unconstitutional, nor could they. "[T]here is no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power, subject of course to constitutional limitations to which all lawmaking is subservient and subject also to the power of Congress at any time to revise, alter, or revoke the authority granted." *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953); *see also Firemen's Ins. Co., supra* note 11, 157 U.S.App.D.C. at 325, 483 F.2d at 1328.

**21.** *See, e.g., City of Bisbee v. Cochise County,* 52 Ariz. 1, 4, 78 P.2d 982, 985 (1938); *Alcorn v. Arkansas State Hosp.,* 236 Ark. 665, 671, 367 S.W.2d 737, 741 (1963); *Noble v. Merchants Nat'l Realty Corp.,* 248 Cal.App.2d 48, 56 Cal. Rptr. 253 (1967); *Berkeley Metro. Dist. v. Poland,* 705 P.2d 1004, 1007 (Colo.App.1985); *City of Shelbyville v. Shelbyville Restorium, Inc.,* 96 Ill.2d 457, 459, 451 N.E.2d 874, 876–77, 71 Ill.

Dec. 720, 722–23 (1983); *Chicago & Northwest Ry. v. City of Osage,* 176 N.W.2d 788, 791 (Iowa 1970); *Unified School Dist. No. 490, Butler County v. Celotex Corp.,* 6 Kan.App.2d 346, 351, 629 P.2d 196, 203 (1981); *Kluckhuhn v. Ivy Hill Ass'n, Inc.,* 55 Md.App. 41, 48–49, 461 A.2d 16, 21, *aff'd,* 298 Md. 695, 472 A.2d 77 (1983) (discussing adverse possession in context of general rules regarding limitation of actions); *State v. Scientific Coating Co.,* 228 N.J.Super. 320, 324, 549 A.2d 874, 876 (1988); *Bd. of Educ., School Dist. 16 v. Standhardt,* 80 N.M. 543, 549, 458 P.2d 795, 801 (1969) (treating subdivisions that perform public functions as "arm of the state"); *Incorporated Village of Island Park v. Island Park–Long Beach, Inc.,* 274 A.D. 930, 930, 83 N.Y.S.2d 542, 543, *rearg. and appeal denied,* 274 A.D. 994, 85 N.Y.S.2d 510 (1948) (dictum); *City of Reidsville v. Burton,* 269 N.C. 206, 210, 152 S.E.2d 147, 151 (1967); *Rowan County Bd. of Educ. v. United States Gypsum Co.,* 87 N.C.App. 106, 113–14, 359 S.E.2d 814, 819, *review denied,* 321 N.C. 298, 362 S.E.2d 782 (1987); *City of Kettering v. Berger,* 4 Ohio App.3d 254, 262, 448 N.E.2d 458, 466, 4 O.B.R. 471, 479–80 (1982); *State v. Shelton,* 727 P.2d 103, 105 (Okla.App. 1986); *Chizek v. Port of Newport,* 252 Or. 570, 576, 450 P.2d 749, 753 (1969); *Frailey Township School Dist. v. Schuylkill Mining Co.,* 361 Pa. 557, 559–60, 64 A.2d 788, 790 (1949); *Bryant v. Mission Mun. Hosp.,* 575 S.W.2d 136, 137 (Tex. Civ.App.1978); *Bellevue School Dist. No. 405 v. Brazier Constr. Co.,* 103 Wash.2d 111, 115–16, 691 P.2d 178, 181–82 (1984).

**22.** *State v. Mudd,* 273 Ala. 579, 582, 143 So.2d 171, 174 (1962); *Mayor & Council of Wilmington v. Dukes,* 52 Del. 110, 121, 157 A.2d 789, 794–95 (1960); *Ideal Farms Drainage Dist. v. Certain Lands,* 154 Fla. 554, 555–56, 19 So.2d

that a circumscribed municipal immunity in the performance of public functions is today the rule in an overwhelming majority of states, and we recognize its authority here.[23] Our opinions in *Weiss* and *Stonewall Construction* merely apply the majority rule.

Moreover, today's holding is consistent with *Metropolitan Railroad* because the Supreme Court there expressly declined to hold that no municipal activities are insulated from the statute of limitations by the doctrine of *nullum tempus.* 132 U.S. at 12, 10 S.Ct. at 23. The Court did note that a municipal corporation generally has "the right to sue and be sued, and [is] subject to the ordinary rules that govern the law of procedure between private persons." *Id.* at 9, 10 S.Ct. at 22. Yet today a host of jurisdictions hold that municipalities enjoy a limited immunity not shared by private parties. Do they contradict a holding of the Supreme Court?

■ The answer lies in the question: they are not contradicting the Supreme Court. The issue in *Metropolitan Railroad* was not, as it is here, the existence of municipal immunity, but rather, whether the District of Columbia might invoke *sovereign* immunity. The answer was that it

could not do so, because the District was not a state, and Congress had then narrowly restricted the rights and powers that the District was authorized to exercise. By "sovereign immunity," of course, we refer to the immunity a political community or institution enjoys by right of its political status, and not merely by virtue of the legal function it performs at a given time.[24] While sovereign immunity may be waived by permission or by statute, *Glidden Co. v. Zdanok,* 370 U.S. 530, 563–64, 82 S.Ct. 1459, 1479–80, 8 L.Ed.2d 671 (1962) (immunity from tort liability), it continues to exist as a privilege the sovereign may reclaim. *Maricopa County v. Valley National Bank,* 318 U.S. 357, 362, 63 S.Ct. 587, 589, 87 L.Ed. 834 (1943) (immunity from liability to suit); *Pass v. McGrath,* 89 U.S.App.D.C. 371, 372, 192 F.2d 415, 416 (1951) (immunity from liability to suit). By contrast, the derivative immunity a municipality enjoys inheres in it only when it performs a sovereign function, such as the vindication of a public right, and then only with reference to the function performed.[25] We do not reach the issue of sovereignty here; we merely hold that in its municipal capacity, the District enjoys a common-law immunity under the doctrine of *nullum tempus.*[26]

234, 235 (1944); *City of New Bedford v. Lloyd Investment Associates, Inc.,* 363 Mass. 112, 117, 292 N.E.2d 688, 691 (1973); *City of Coon Rapids v. Suburban Eng'g, Inc.,* 283 Minn. 151, 154, 167 N.W.2d 493, 495 (1969); *In re Ernst's Guardianship,* 158 Neb. 15, 16, 62 N.W.2d 110, 111 (1954); *Lakeville Township v. Northwestern Trust Co.,* 74 N.D. 396, 398, 22 N.W.2d 591, 592 (1946); *Hatcher v. State,* 125 Tex. 84, 87, 81 S.W.2d 499, 500 (Tex.Crim.App.1935).

It should be noted, however, that of these eight authorities, two involved municipal immunities specifically abrogated by statute, *Ideal Farms, supra,* 154 Fla. at 555, 19 So.2d at 235; *New Bedford, supra,* 363 Mass. at 117, 292 N.E.2d at 691, and one denied the municipality an immunity that it did not even recognize to be available to the state. *Coon Rapids, supra,* 283 Minn. at 154, 167 N.W.2d at 495.

**23.** The doctrine is well settled enough to be stated as the "general rule" in the textbooks. *See* 17 E. McQuillin, Municipal Corporations § 49.06 (3d ed. 1972 & 1988 Cum.Supp.).

**24.** This distinction has sometimes been expressed as a dichotomy between "sovereign immunity," as we use it here, and "governmental immunity," which is enjoyed by municipal sub-

divisions "only when engaged in 'governmental' as distinguished from 'proprietary' functions." *Myers v. Genesee County Auditor,* 375 Mich. 1, 6, 133 N.W.2d 190, 191 (1965); *see also Ramsey v. Prince George's County,* 18 Md.App. 385, 387 n. 2, 308 A.2d 217, 219 n. 2 (1973) (citing *Myers*); *Ross v. Consumers Power Co.,* 420 Mich. 567, 598, 363 N.W.2d 641, 650 (1984) (citing *Myers*); 57 Am.Jur.2d *Municipal, County, School and State Tort Liability* § 3 (1988).

**25.** *See* authorities cited *supra* note 24.

**26.** Accordingly, we do not reach the effect of changes in the District's political status on the extent to which it is protected by sovereign privileges beyond those attached to the particular powers it may perform. *Compare Metropolitan Railroad, supra,* 132 U.S. at 7, 10 S.Ct. at 21 ("Legislative powers have now ceased, and the municipal government is confined to mere administration."), *with* Home Rule Act § 102 ("the intent of Congress is to delegate certain legislative powers to the District of Columbia ... [and] grant to the inhabitants of the District of Columbia powers of local self-government ..."). In dicta in *Ward, supra,* 494 A.2d at 668, we took a

Underlying our recognition of a doctrine widely applied elsewhere is a functional rather than a formalistic reading of the immunity issue. We have already noted that, like immunity from suit, immunity from statutes of limitations and repose is the artifact of a royal prerogative. Nevertheless, courts did not vest this right in the successor governments as a mere legal inheritance, but adopted a more substantive justification consistent with the public good: defense of the public interest and public fisc from the negligence of the government's agents. The administration of the public interest and the public fisc in the District of Columbia has been vested by act of Congress in the District of Columbia government. That government has been charged, among other things, with seeing to the health and safety of the citizens in its jurisdiction. *See* D.C.Code § 1–315 (1987 Repl.) (authorizing specific police regulations); D.C.Code § 1–319 (1987 Repl.) (authorizing general regulations "for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property"). Under such circumstances, to hold that legal immunity resides in the actor rather than the act would divorce the principle from its purpose. It would expose the citizenry of the District, unlike the citizens of any other United States jurisdiction, to hazard without redress. Indeed, it would render nugatory the very functions Congress intended to strengthen by vesting them in a local government.

C. *The Legal Relationship Between the District and Congress*

Appellees attempt to persuade us that because Congress is sovereign in the District, the government of the District of Columbia is devoid of the authority necessary to enjoy municipal immunity. They contend by analogy to the relationship between a state and its municipal subdivisions that Congress is sovereign, and is thus the sole repository of sovereign immunity in the District. We disagree. The abundance of cases holding that municipal subdivisions enjoy limited immunities belies this position, and the logic underlying Congress' delegation of powers renders it completely untenable.

▮▮▮ There is general agreement that the Constitution gives Congress plenary power over the District of Columbia.[27] Thus there can be no doubt that theoretically, if Congress chose, it could govern the District directly, without the help of a municipal government or its agencies. Since Congress is sovereign in the District, it enjoys the usual sovereign immunities, including the benefit of *nullum tempus*. In creating a municipal government, and in ultimately granting it broad governmental powers, Congress intended, among other things, to "relieve [itself] of the burden of legislating upon essentially local District matters." Home Rule Act, § 102(a) (Statement of Purposes). The Home Rule Act explicitly provides that

the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this Act subject to all the restrictions and limitations imposed upon the States by the tenth section of the first article of the Constitution of the United States.

skeptical view of the impact such changes might have. We note that under the Home Rule Act, the District government continues to exist as a "body corporate for municipal purposes, and may ... sue and be sued ... and exercise all other powers of a municipal corporation...." Home Rule Act § 102(a).

**27.** "Congress' power over the District of Columbia encompasses the *full* authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative." *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 76, 102 S.Ct. 2858, 2874, 73

L.Ed.2d 598 (1982) (emphasis in original). *See* U.S. Const., Art. I, § 8, cl. 17:

The Congress shall have Power ... [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings....

*Id.,* § 302. Thus Congress granted broad, but not exclusive, legislative powers to the District, analogous to the powers of the states, and directed to the performance of many "public functions" typically exercised by the government of a state.

The supposition that Congress delegated to the District government "all rightful subjects of legislation ... consistent with the Constitution," and established the foundations of self-rule, without also granting the District immunity under the doctrine of *nullum tempus,* engenders serious logical difficulties. It involves admitting that, except when Congress explicitly disapproves District legislation, it becomes the law of the jurisdiction, and that all significant public policy and public services originate with the agencies and instrumentalities of the District, yet only Congress enjoys immunity from the running of the statutes of limitations and repose. It suggests that while the District government performs practically all public functions in this jurisdiction, only Congress, which rarely participates directly in local affairs, enjoys the benefit of an immunity designed to protect those public functions. Thus, under this theory, Congress' immunity is irrelevant when the District acts, even if the District performs functions—as it must—which are within the scope of congressional immunity. The protection is thereby separated from its purpose, and the public, which is supposed to be the beneficiary of the immunity, is bereft of it. Of course, "[t]his

would be to overthrow in fact what was established in theory; ... an absurdity too gross to be insisted on." [28]

It cannot be argued that Congress intended to remove this protection or diminish its own power by the mere act of delegating it to the District. Yet this is the inevitable consequence of a formalistic, rather than functionalistic, reading of the *nullum tempus* doctrine. Common sense counsels that the protection of *nullum tempus,* if it is to be meaningful, must follow the function performed, and not reside only in institutions that, as a matter of policy, refrain from exercising the functions the doctrine was designed to insulate.[29] We therefore conclude that the District of Columbia is immune from the running of the statutes of limitations and repose when it brings suit seeking to vindicate public rights and involving the performance of public functions.

## III. THE PUBLIC FUNCTION REQUIREMENT

■■■ Although we have now concluded that the District enjoys the immunity it seeks, we emphasize that this immunity is highly circumscribed. The government enjoys immunity from the running of time only when it sues to vindicate public rights. Thus, our task will not be complete until we have determined whether, with respect to the particular issue on appeal, the District is suing to vindicate a public or a proprietary right.[30] This question is by no

---

**28.** The voice we adopt here is, of course, that of Chief Justice Marshall, speaking in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

**29.** Indeed, it can be argued that the congressional delegation of authority to perform public functions automatically includes a delegation of the privileges and immunities that are part and parcel of that authority. We refer again to appellees' citation of our opinion in *Ward v. District of Columbia, supra,* 494 A.2d at 668 & n. 1. In *Ward* we questioned our earlier holdings in *Weiss, supra,* and *Stonewall Construction, supra,* which we now specifically reaffirm. We remarked that *Stonewall Construction,* in which we found that the District of Columbia Unemployment Compensation Board enjoyed immunity from the statute of limitations, involved an exercise of congressional rather than District sovereignty, since the Board had been created

by congressional legislation. *Id.* (interpreting D.C.Code § 46–304 (1951)). But of course, every District instrumentality ultimately derives its authority, through the Home Rule Act or other legislation, from a congressional mandate. Thus, to the extent that the rule of *Stonewall Construction,* as interpreted by *Ward,* applied to the Unemployment Compensation Board, it must also apply to every District instrumentality that performs a delegated public function.

**30.** The distinction between public and private functions retains its vitality as applied to the *nullum tempus* doctrine despite the ruling of the United States Court of Appeals for the District of Columbia Circuit in *Spencer v. Gen. Hosp. of the District of Columbia,* 138 U.S.App.D.C. 48, 50, 425 F.2d 479, 481 (1969), that it lacks continuing vitality in tort immunity cases. In the context of a tort action against a public hospital,

means an easy one. The line between rights that accrue to the public's benefit and those that are ultimately proprietary to the government is a fine one, especially since any financial loss to the government is ultimately a loss to the public fisc.

In *Weiss, supra,* where we held that the District's suit to recover fees owed to a public hospital was not barred by the statute of limitations, we said:

> The District of Columbia is seeking to replenish its treasury of money expended by a public instrumentality in the exercise of a public function. Recovery of the funds, which will benefit the public as a whole when applied to the continued operation of Glenn Dale Hospital, should not be made contingent on the diligence of public servants.

263 A.2d at 640. This passage emphasizes the expenditure of the disputed monies by a public instrumentality, its application to a public function, and the policy against allowing the laxity of public servants to erect a bar to suit. We stress, however, that while all monies the District sues upon affect the public fisc, it does not follow that every time the District sues for money it performs a public function. While the line is hard to draw, it can fairly be stated that something more is required than a naked financial interest; thus in *Weiss* we spoke of replenishing the treasury of funds earmarked for the performance of a particular public function. Where the District acquires a right of action directly related to its duty to perform a service to the public, or to vindicate an overwhelmingly public interest or right, a suit to recover money damages to enable the District to perform that service is public rather than proprietary. Of course, there may be other considerations, unique to each case, which must guide future courts in determining whether the public function test is met.

The facts of the claim on appeal satisfy us that the District is suing to vindicate a public right. Only the most narrow reading could interpret the District's claims as purely proprietary. The hazard presented, as we have seen, is an enormous one. More than 2400 public buildings are affected. Many of these buildings, such as schools, libraries, hospitals, and government offices, are for the general use of the public, and hundreds or even thousands of people pass through each of them every day. Any child who grows up in the District and attends a public school is massively exposed; anyone who works for the District government or frequents District offices suffers similar exposure. Many thousands of residents in District public housing literally live with this threat. The men and women who serve the jurisdiction in the police and fire departments are exposed daily. We have seen that the diseases asbestos engenders are numerous, painful and deadly; the percentage of those exposed who eventually fall victim to an asbestos-related illness is prohibitively high. Unquestionably, the public at large has a profound interest in the elimination of a danger so extreme and widespread.

At the same time, where other factors point to the public nature of the claim, it becomes irrelevant that the District is suing to replenish its own funds. Naturally, a suit of this kind involves the government's interest in seeing to it that the treasury suffers no loss as the result of expenditures to remove a public danger. However, it is impossible to extricate this proprietary interest completely from the larger public function; every time a government sues for money to vindicate a public interest, it is in some sense its "own" money that the government seeks to replenish. At oral argument, appellees at-

---

the *Spencer* court observed that governmental and propriety roles are interrelated and sometimes difficult to distinguish. "[W]e perceive no distinctions," the court explained, "between the operation of hospitals, on the one hand, and schools, on the other, that offer meaningful bases for differentiation between tort liability for acts of the kind alleged in those cases and in the one before us." *Id.* The *Spencer* court

found that the distinction often impeded suits even when it was in the public interest for them to proceed, and therefore discarded the distinction. However, the decision was by its terms applicable to tort cases brought against a municipal corporation, and its rationale in no way suggests that the distinction should be discarded where, as in cases involving the principle of *nullum tempus,* it protects the public interest.

tempted to draw a comparison between the interest the government asserts here and that of a large landlord, or the owner of an office building, whose property is similarly contaminated. They argued that the former case, like the latter, presented a purely proprietary interest. However, apart from differences in the scale of the threat, it is obvious that a private owner never performs a "governmental" function, even if her problems are comparable to those of the government, simply because she is not a government herself. No matter how many tenants she may have, her duties to them are private ones because they arise from private contractual obligations and she is a private person; but the government performs a public duty when it protects the health and safety of the public at large. Here the government is suing for the cost of removing a public danger resulting from the alleged tortious activities of appellees; the damages recovered from such a suit would therefore be used in the performance of a public function. Under these circumstances, the District's financial interest is secondary.

Appellees have cited a number of cases from other jurisdictions which, they assert, prove that the interest that the District asserts here is only a proprietary one. They observe that in *Trustees of Bergen Community College v. J.P. Fyfe, Inc.*, 188 N.J.Super. 288, 297, 457 A.2d 83, 88 (1982), *aff'd*, 192 N.J.Super. 433, 471 A.2d 38 (1983), *certification denied*, 96 N.J. 308, 475 A.2d 598 (1984), the court held, "[W]here plaintiff [community college] sues because of alleged defects in building roofs, it is clear that it stands on no different footing from any owner of a building." However, *Fyfe* dealt only with structural roofing defects, and there is no indication that those defects posed a danger to public safety or welfare. In the context of mere repairs, therefore, the college's suit was essentially indistinguishable from a private action of the same nature. Further, in *Fyfe*, the plaintiff was a county college legally distinct from the state, county, or municipality, and subject by statute to the rules governing suits by private parties. By contrast, the instant case involves a suit

by the government of the entire District, which is, moreover, a distinct political community and not the political subdivision of a state. While the District bears the relationship of a municipality to the United States Government, there is no larger population, distinct from the populations of the other states, of which it is a subset. Accordingly, the municipal status of this jurisdiction does not vitiate the impact of the alleged tort on the "general public" rather than some subgroup within the whole jurisdiction.

Appellees also argue from a series of federal cases in Tennessee that the removal of asbestos from schools is not a public function. The Sixth Circuit in *Anderson County Board of Education v. National Gypsum Co.*, 821 F.2d 1230, 1233 (6th Cir. 1987), applying Tennessee law, held that a suit by a local board of education to remove asbestos from public school buildings was not brought to further a public function, since it was one "in which only local citizens [were] interested, as distinguished from [those] in which all the people of the state are interested," *id.*, and it did not affect the finances of the state as opposed to the school board. Although we do not necessarily adopt the test used by the Sixth Circuit in applying Tennessee law, we note that the District's claim would survive it, since all citizens of the District are affected by the asbestos contamination involved, and the District's finances, rather than those of a subdepartment such as a local school board, are at stake.

In *Kelley v. Metropolitan County Board of Education*, 615 F.Supp. 1139, 1152 (M.D.Tenn.1985), *rev'd on other grounds*, 836 F.2d 986 (6th Cir.1987), the court stated, in dicta, that while the provision of public education is a governmental function, the maintenance of school buildings is merely proprietary. *Kelley*, however, noted this principle only by way of example, since the case involved school desegregation, not the abatement of a public health hazard. Moreover, in so commenting, the *Kelley* court relied on a magistrate's opinion in *County of Johnson, Tennessee v. United States Gypsum Co.*, 580

F.Supp. 284 (E.D.Tenn.1984), which was soon reversed in relevant part in *County of Johnson, Tennessee v. United States Gypsum Co.*, 664 F.Supp. 1127 (E.D.Tenn.1985) (because operation of public schools is a public function, statute of limitations is inapplicable to county action for removal of asbestos in schools).

Finally, appellees cite *West Haven School District v. Owens–Corning Fiberglass Corp.*, 721 F.Supp. 1547 (D.Conn. 1988), wherein the court held that the statute of limitations applied to a local school district in its action to recover asbestos abatement costs. The *West Haven* court, like the court in *Anderson County*, held that the action involved a local rather than a statewide interest. As we have noted above, this issue is either inapplicable or operates in favor of the District, since the hazard potentially affects practically all of its residents. However, the *West Haven* court, citing *Gauvin v. City of New Haven*, 187 Conn. 180, 184, 445 A.2d 1, 3 (1982), also held that "government acts" (as opposed to proprietary acts) are not only performed for direct public benefit, but are of a supervisory or discretionary, rather than ministerial, nature. Thus, acts "performed in a prescribed manner without the exercise of judgment or discretion," *West Haven, supra,* 721 F.Supp. at 1551, are unprotected by municipal immunity. However, we could find no other authority for the application of the "discretionary function" requirement to immunity from a statute of limitations. *Gauvin,* like all other cases that have applied the discretionary function

rule, interpreted sovereign immunity from tort liability, and not immunity under *nullum tempus.* See, e.g., *Spencer, supra,* 138 U.S.App.D.C. at 51, 425 F.2d at 482. This distinction is important, since sovereign immunity from tort liability was designed to protect the discretionary acts of governmental officers from the chilling effects of potential liability, while preserving the public's access to justice in merely ministerial cases.[31] No similar policy operates where the government itself brings suit to vindicate public rights. As the District has correctly stated in its reply brief:

> When the government sues to recover from wrongdoers, it serves a public purpose.... When, however, government itself has been the wrongdoer, entirely different considerations apply. Courts are naturally reluctant to construe governmental functions broadly when to do so means that the government escapes liability for its misdeeds and its victims remain uncompensated.

Reply Brief for Appellant at 21. Where the *nullum tempus* immunity exists to protect the public from the negligence of public agents or officers, *see Guaranty Trust, supra,* 304 U.S. at 132, 58 S.Ct. at 788–89, we do not think it is relevant whether the function that agent or officer failed to perform was ministerial or discretionary.[32]

Finally, we are unconvinced by appellees' analogy to other District of Columbia "public function" cases, which all construe the public or proprietary nature of duties underlying tort actions brought against the

---

**31.** *See City of Shelbyville, supra* note 20, 96 Ill.2d at 459, 451 N.E.2d at 877, 71 Ill.Dec. at 723,

> The purpose of the two doctrines, as we understand them, is different: the former [*nullum tempus* ] is designed to preserve public rights when the government is slow to assert them on the public's behalf, while the latter [immunity from tort liability] is used to promote the autonomy of public bodies as entities by insulating them from liability for their actions. They are separate actions, and we do not interpret [the abolition of the latter] as requiring abolition of governmental immunity from statutes of limitation.

**32.** Moreover, appellees argue, quoting *Shifrin v. Wilson,* 412 F.Supp. 1282, 1307 (D.D.C.1976),

that conduct may be deemed discretionary only if liability for the activity would "pose threats to the quality and efficiency of government in the District." Thus, even if the discretionary function test were applicable, under the test proposed by appellees, we would hold the District's intended action in this case to be discretionary, since, contrary to appellees' assertions, the want of immunity would seriously jeopardize the public fisc, thereby undermining the District's efforts to remove the hazard as well as to perform other public functions. Parenthetically, we also note that *Shifrin* construed "discretionary functions" in inquiring whether there was sovereign immunity from tort liability, and not from the effect of a statute of limitations.

District. All of these cases involve lesser functions which, while associated with duties performed by the District to secure public health or safety, are of a lesser scope and would not affect public health or safety as a whole. *See Scull v. District of Columbia,* 102 U.S.App.D.C. 104, 105, 250 F.2d 767, 768 (1957), *cert. denied,* 356 U.S. 920, 78 S.Ct. 703, 2 L.Ed.2d 715 (1958) (installation of water mains not a governmental function for tort liability purposes); *District of Columbia v. Green,* 96 U.S. App.D.C. 20, 21, 223 F.2d 312, 313 (1955) (operating a public market a proprietary function for tort liability purposes); *Smith v. District of Columbia,* 89 U.S.App.D.C. 7, 10, 189 F.2d 671, 674 (1951) (declining to hold District immune from tort liability by governmental function analysis for failing to remove snow, but absolving District of liability under ordinary negligence standard); *Thomas v. Potomac Electric Power Co.,* 266 F.Supp. 687, 692 (D.D.C.1967) (operating a swimming pool a proprietary function). In each, a narrow interest was at stake, involving the safety of individuals or small numbers of people for tort liability purposes; none involved a hazard with an impact as broad as that presented by the widespread asbestos contamination of public facilities. We therefore reject the inference that, because we have held certain duties involving the removal of minor individual hazards to be proprietary, any response to a threat to public safety, no matter how large the threat or for what purpose the response is considered, must also be considered proprietary. Rather, as the foregoing analysis makes clear, each case must be reviewed on its own merits, taking into account the scope and severity of the problem, the cross-section of the population affected, and any other considerations that may clarify the extent to which the public at large is interested in the outcome.

Considering these factors, we must conclude that appellant has articulated a public interest worthy of the municipal *nullum tempus* protection.

## IV. CONCLUSION

Because we find that the District of Columbia enjoys a limited municipal immunity from the effects of the statutes of limitations and repose, and further, that it is a governmental function of the District to remove and abate the widespread contamination of public buildings with asbestos, which poses a substantial threat to public health, we conclude that the District may bring an action for damages resulting from that contamination even after the statutes of limitations and repose would ordinarily have run. Accordingly, we conclude that the trial court improperly granted summary judgment with respect to the claims on appeal. The order granting summary judgment is therefore reversed, and the case remanded for proceedings consistent with this opinion.

*Reversed and remanded.*