(No. 57183.—

THE CITY OF SHELBYVILLE, Appellant, v. SHELBY-VILLE RESTORIUM, INC., Appellee.

*Opinion filed June 17, 1983.*

Franklin E. Dove, of Shelbyville, for appellant.

William L. Turner, of Shelbyville (James C. Craven, of Springfield, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

In this appeal by defendant, Shelbyville Restorium, Inc., a home builder, we are asked to decide whether the statute of limitations may be raised as a defense to an action by a municipality seeking money damages and an order compelling the defendant to construct certain streets in a subdivision. The circuit court of Shelby County ruled that it could and dismissed the action; the appellate court, in a Rule 23 order (87 Ill. 2d R. 23), held that the municipality was immune from the defense and remanded the cause for trial (106 Ill. App. 3d 1164).

The city of Shelbyville brought this action to enforce and recover damages under an ordinance which it passed in 1967 at the time it approved defendant's subdivision plat and annexed the subdivision to the city. The complaint, filed in 1980, alleged that the 1967 ordinance required as a condition of annexation that certain streets should be constructed in the subdivision and that the city should bear none of the expense of constructing them, that the ordinance remains in effect, that the defendant has failed to construct many of the streets in question, that those streets which defendant has constructed did not meet the specifications set forth in the ordinance, and that the city eventually constructed or repaired the streets at great ex-

pense to itself. The first three counts sought money damages for expenditures which the city incurred or projected it would incur in remedying defendant's omissions, while counts IV and V sought an order requiring defendant to construct certain streets on which work had not already begun and enjoining the sale by defendant of any unsold lots in the subdivision until such construction was completed. The defendant filed a motion to dismiss the complaint, asserting that it did not state a cause of action and also invoking the bar of the statute of limitations. The circuit court addressed only the latter contention; the appellate court, in reversing and remanding, similarly addressed only the claim involving the statute of limitations. The reversal was grounded on the common law rule that the statute of limitations may not be asserted against the State or its county or municipal subdivisions as plaintiffs in actions involving "public rights" (*People ex rel. City of Chicago v. Commercial Union Fire Insurance Co.* (1926), 322 Ill. 326, 332) and the appellate court's conclusion that the rights sought to be vindicated by the city of Shelbyville were of a public character.

Defendant argues that because Illinois has expressly disavowed the concept of sovereign immunity both by decision of this court (*Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11) and in its 1970 Constitution (Ill. Const. 1970, art. XIII, sec. 4), the common law exemption from statutory limitations periods may no longer be invoked by municipalities of this State even where public rights are involved. Defendant's position is that governmental immunity from limitations periods is a species of sovereign immunity, both kinds of immunity being vestiges, in their origin and effect, of the royal prerogative which derived from the maxim that the King could do no wrong. (*In re Estate of Bird* (1951), 410 Ill. 390, 397; *Clare v. Bell* (1941), 378 Ill. 128, 131.) Defendant argues that it would be anomalous for this court to hold that

the former doctrine is still the law despite the abolition of its twin.

While sovereign immunity from liability and governmental immunity from statutes of limitation shared a philosophical origin and have the similar effect of creating a preference for the sovereign over the ordinary citizen, we do not believe that the abolition of the first of these doctrines requires abandonment of the second. At common law sovereign immunity derived from the idea that the King was the source of all rights and privileges and that, as a consequence, any right asserted by a citizen against the King was an assertion of rights against the source of rights and could not be entertained unless the King consented to the suit. The act of consent by the government was interpreted as a creation of the right on which the suit was based, and therefore came, even in this country, to be viewed as a condition precedent to the suit. (11 Halsbury's Laws of England, par. 1401 (4th ed. 1976); see *Feres v. United States* (1950), 340 U.S. 135, 95 L. Ed. 152, 71 S. Ct. 153; *Kawananakoa v. Polyblank* (1907), 205 U.S. 349, 51 L. Ed. 834, 27 S. Ct. 526.) The doctrine of sovereign immunity from suit, while justified in this manner, went under the slightly misleading but popular maxim of "the King can do no wrong" ("*Rex non potest peccare*"), from which it was but a slight jump in logic to conclude that the King could not commit mistakes such as *laches* either (*County of Piatt v. Goodell* (1880), 97 Ill. 84, 88; *United States v. Central Soya, Inc.* (7th Cir. 1982), 697 F.2d 165, 166). This conclusion also entered our common law in the form of the maxim on which the city relies here: "time does not run against the King" ("*nullum tempus occurrit regi*").

American courts in this century have viewed both doctrines as embodying a policy of protecting the public purse rather than as perpetuating philosophical notions of sovereign power and incapacity to err. However, their evolution

in this regard was not parallel.

In discussing sovereign immunity from suit, one commentator observed that the doctrine was best viewed as preventing "the subjection of the state and federal governments to *** serious interference with the performance of their functions and with their control over their respective instrumentalities, funds, and property." (Block, *Suits Against Government Officers and the Sovereign Immunity Doctrine,* 59 Harv. L. Rev. 1060, 1061 (1946).) Taken at its word, as it was in most cases, the doctrine continued to prevent all suits against the sovereign from going forward in the absence of consent, at least in the sovereign's own courts (see *Nevada v. Hall* (1979), 440 U.S. 410, 421, 59 L. Ed. 416, 425, 99 S. Ct. 1182, 1188), regardless of the purpose of the activity in which the sovereign was engaging when it incurred the alleged liability. The consent, even where explicit, was often narrowly construed. See *Jaffee v. United States* (3d Cir. 1981), 663 F.2d 1226, *cert. denied* (1982), 456 U.S. 972, 72 L. Ed. 2d 845, 102 S. Ct. 2234.

While this court's decision to discard sovereign immunity was motivated at least in part by a distaste for the inflexibility of the doctrine and its inamenability to rules of reason (*Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, 16, 18), the inflexibility and the continued emphasis placed on consent to suit by courts adhering to sovereign immunity was the inevitable result of viewing the doctrine as necessary to preserve the government's control over its officers and instrumentalities from external interference.

By contrast, although the doctrine of immunity from statutes of limitation "developed in England as a royal prerogative, it is supported in modern law by the policy judgment that the public should not suffer because of the negligence of its officers and agents" in failing to promptly assert causes of action which belong to the public. (*State ex rel. Board of University & School Lands v. Andrus* (8th

Cir. 1982), 671 F.2d 271, 274, *rev'd on other grounds sub nom. Block v. North Dakota ex rel. Board of University & School Lands* (1983), 461 U.S. _____, 75 L. Ed. 2d 840, 103 S. Ct. 1811; see also *Guaranty Trust Co. v. United States* (1938), 304 U.S. 126, 132, 82 L. Ed. 1224, 1228, 58 S. Ct. 785, 788-89; *United States v. Central Soya, Inc.* (7th Cir. 1982), 697 F.2d 165, 166; 34 Am. Jur. *Limitation of Actions* secs. 388 through 399, and particularly at page 301 (1941).) In accord with the rationale, the practice in Illinois has been to determine whether the right which the plaintiff governmental unit seeks to assert is in fact a right belonging to the general public, or whether it belongs only to the government or to some small and distinct subsection of the public at large. See, *e.g., Winakor v. Annunzio* (1951), 409 Ill. 236, 249 (belated change of variable contribution rate by Department of Labor permitted because it was in aid of the public purpose of relieving unemployment); *Clare v. Bell* (1941), 378 Ill. 128, 130-31 (action to collect penalties on delinquent property taxes allowed to proceed, apparently because the right to collect them was "public"); *People ex rel. City of Chicago v. Commercial Union Fire Insurance Co.* (1926), 322 Ill. 326 (action to impose city license fee on a foreign fire insurance company held "public" because the proceeds would benefit city's fire department); *City of Chicago v. Dunham Towing & Wrecking Co.* (1910), 246 Ill. 29 (city's interest in recovering damages for destruction of bridge which it was under obligation to maintain held "private"); see generally 34 Am. Jur. *Limitation of Actions* sec. 395, at 309-10 (1941).

The question of who would be benefited by the government's action and who would lose by its inaction is of paramount importance in statute-of-limitations immunity cases, while it is not central to the modern rationale underlying sovereign immunity and is not even asked in the majority of cases involving that doctrine. The purpose of the two doctrines, as we understand them, is different: the former

is designed to preserve public rights when the government is slow to assert them on the public's behalf, while the latter is used to promote the autonomy of public bodies as entities by insulating them from liability for their actions. They are separate doctrines, and we do not interpret either article XIII, section 4, of the 1970 Constitution or our decision in *Molitor* as requiring abolition of governmental immunity from statutes of limitation.

The seeming equation by this court of sovereign and limitations immunity in *dictum* in *In re Estate of Bird* (1951), 410 Ill. 390, 397, furnishes no authority for the result which defendant urges, as that case did not require or depend on a comparison of the doctrines as the instant case does. Nor are we convinced that abandonment of government immunity from statutes of limitation would be wise. Inasmuch as citizens who share a public right which has been violated may be unable in certain cases to bring suit on their own behalf while the government has a representative interest in the controversy (*Clement v. Chicago Park District* (1983), 96 Ill. 2d 26; see *Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516, 524-25 (individual residents of neighborhood lacked standing to sue for landmark designation of building)), abolition of the government's immunity from limitations defenses would expose these citizens to the harsh consequences of neglect by officials over whose actions they had no control. Long delays by the government in instituting suit, of course, cause harm to the defendant and are in the interest of no one; however, we are unwilling to change a well-established rule of law so as to leave citizens who have suffered an injury remediless or make them wait until the next election for their "remedy."

Defendant argues next that regardless of whether we adhere to the rule that municipalities are immune from limitations defenses in asserting public rights, the city of Shelbyville is not asserting such a right and thus must be

barred from bringing suit. This argument is based on *City of Chicago v. Dunham Towing & Wrecking Co.* (1910), 246 Ill. 29, in which this court decided that an action by a city seeking damages for loss of a bridge which constituted part of a public street was an attempt to vindicate "private" rights only and was barred by the statute of limitations. The public was viewed as having an interest only in its ability to use the street, as distinguished from the ability of the city to maintain it in working order.

We disagree with the position advanced by the defendant. It is apparent that the safety of all persons who have occasion to use the streets at issue here will depend on the workmanlike construction and maintenance of these streets. Insofar as it is the continuing responsibility of cities to ensure such construction and maintenance for the use of the public (Ill. Rev. Stat. 1969, ch. 24, par. 9—1—1 *et seq.*), the inability of the city of Shelbyville to enforce its annexation agreement or compel payment by the defendant will affect the city's finances and may impair its ability to build or oversee the construction or maintenance of streets within its jurisdiction in the future. See *Greenwood v. Town of LaSalle* (1891), 137 Ill. 225, 229 (municipality's right to collect local property taxes ruled "public" because the "taxes may be levied for purposes in which the public, generally, are directly interested, such as 'constructing or repairing roads, bridges or causeways' within the town").

This, we believe, is sufficient to render the city's interest in bringing this lawsuit "public." While we acknowledge that *Dunham Towing* holds to the contrary, we believe that it is consistent with later authority to regard such exercises of civic initiative as being in the interest of the general public. (See *People ex rel. City of Chicago v. Commercial Union Fire Insurance Co.* (1926), 322 Ill. 326, 332-33 (action to compel insurance company to report local receipts for purposes of a city license tax allowed to go forward; court found that the purpose of the tax, the funding

of the city's fire department and a civic fireman's pension fund, was "public" because the maintenance of a fire department was an exercise of the police power granted to cities for the purpose of ensuring the public safety, health and welfare); *cf. Clare v. Bell* (1941), 378 Ill. 128, 131 (action to collect county property taxes held to be public because "the public revenues are involved").) Similarly, our view in this case is that a cause of action for recovery of damages for building and maintaining streets which should have been built in a proper manner by the defendant is "public" because the defendant, by failing to perform its alleged obligation, has necessitated the expenditure of the public revenues for that purpose. We overrule *Dunham Towing* to the extent that it holds otherwise, for we regard the distinction that decision attempted to draw between title to the public ways and claims for compensation for damage done to them as unrealistic and overly technical.

We find unpersuasive the defendant's suggestion that because the maintenance of streets was held to be a function not subject to sovereign immunity in this State (9 Ill. L. & Prac. *Cities, Villages, and Other Municipal Corporations* sec. 491, at 43 (1954) ("[m]unicipal corporations have no right to place obstructions in their streets which will interfere with the ordinary and usual use thereof by the traveling public, and they are liable to respond in damages to a person injured, while in the exercise of ordinary care, in consequence of their negligence in permitting dangerous obstructions to remain on the public streets")), it should be similarly held "private" for purposes of limitations immunity. We have already discussed the differences between the two kinds of immunity. We feel no compulsion to regard the construction and maintenance of public streets as a "private" matter for statute-of-limitations purposes simply because the city would be liable in tort for its negligence in connection therewith. Nor do we find any logic in allowing the designation of the city's action as "public" or

"private" to be controlled by the origin of the city's rights in a private contract or local ordinance (*People ex rel. City of Chicago v. Commercial Union Fire Insurance Co.* (1926), 322 Ill. 326, 332) or by the fact that part of the relief sought is in the form of damages. We hold that the interest of the city of Shelbyville in the construction of streets in the defendant's subdivision in a workmanlike manner and under the payment terms allegedly agreed upon is public in nature, and we affirm the appellate court's decision in this regard.

Defendant argued alternatively in the circuit and appellate courts that the complaint should have been dismissed for failure to state a cause of action inasmuch as the proviso in the annexation agreement which purportedly obligated defendant to pay for the streets cannot be found in the record or in the ordinance itself. This argument was of necessity not addressed by the trial court, which dismissed the action as time-barred, and it was not addressed by the appellate court either, even though it remanded the cause. Although defendant requests us to pass on the motion, and although the appellate court appears to do this on occasion in cases such as this (*e.g., Lundstrom v. Winnebago Newspapers, Inc.* (1963), 42 Ill. App. 2d 306, 311), we remand the cause to the circuit court with instructions to consider the motion to dismiss.

*Affirmed and remanded,*
*with directions.*

JUSTICE CLARK, dissenting:

The court today has said that it did not believe that the abolition of sovereign immunity in this State meant that governmental immunity from statutes of limitations was also abolished. The detailed delineation of the evolution of what the majority construes as different doctrines is irrelevant in view of section 4 of article XIII of the 1970 Constitution, which provides that "Except as the General Assem-

bly may provide by law, sovereign immunity in this State is abolished."

Pursuant to section 4 of article XIII, the legislature enacted Public Act 77—1776 (Ill. Rev. Stat. 1979, ch. 127, par. 801), which provides that the State of Illinois may not be made a defendant or a party in any court except as set forth in the Court of Claims Act (Ill. Rev. Stat. 1979, ch. 37, par. 439.1 *et seq.*). While the legislature chose to reinstate a more limited avenue of relief for claims against the State of Illinois in the form of the Court of Claims Act, no such action was taken concerning municipalities. Today we are allowing the city of Shelbyville to hide beneath a cloak of immunity that the Constitution of 1970 eliminated and that the General Assembly chose not to provide for municipalities. I feel that the majority winds its way around a very thin analytical path while ignoring a plain and straightforward reading of the 1970 Constitution.

The majority attempts to draw a distinction between the purpose of immunization of the sovereign against statute-of-limitations defenses and the purpose of immunizing the sovereign from claims made against it. In my opinion, it is a distinction without merit.

The purpose of article XIII, section 4, of the 1970 Illinois Constitution's abolition of sovereign immunity was to repudiate the sovereign's preference in common law over its citizens and thereby debunk the myth that "the king can do no wrong."

It is not reasonable then to construe section 4 of article XIII as allowing the proposition that "time does not run against the king" to remain in effect.

That is, however, precisely the construction given by the majority in permitting the city of Shelbyville to bring this action 13 years after the event, and seven years after the statute of limitations had run.

I believe that, in abolishing local government's immunity from suit, the framers of the 1970 Constitution clearly

intended that the sovereign and citizens be on equal footing. If the city of Shelbyville can raise the defense of improper delay against a citizen suing it, there is no legitimate reason why a citizen being sued by the city of Shelbyville should not be able to raise the same defense. The majority today has extended to the city of Shelbyville that which the legislature refused to and the result of which is to subject the defendant to a suit that it would not face had the plaintiff been any private plaintiff in this State. I respectfully dissent from such an unfounded result.