THE CITY OF CHICAGO *ex rel.* RAYMOND G. SCACHITTI *et al.*, on Behalf of Itself and All Other Municipal and Governmental Entities Similarly Situated, Plaintiffs-Appellants, v. PRUDENTIAL SECURITIES, INC., *et al.*, Defendants-Appellees.—THE COUNTY OF DU PAGE *ex rel.* ADRIANA DiPAOLO, on Behalf of Itself and All Other Municipal and Governmental Entities Similarly Situated, Plaintiffs-Appellants, v. WILLIAM BLAIR AND COMPANY, L.L.C., Defendant-Appellee (Jerry L. Lacy, Defendant).

First District (5th Division)   Nos. 1—01—0851, 1—01—2111 cons.

Opinion filed June 28, 2002.

Krislov & Associates, Ltd., of Chicago (Clinton A. Krislov, Robert J. Stein III, and Michael R. Karnuth, of counsel), for appellants.

Ungaretti & Harris, of Chicago (Miriam G. Bahcall and Rawn Howard Reinhard, of counsel), for appellee Prudential Securities, Inc.

Foley & Lardner, of Chicago (Douglas M. Hagerman, of counsel), for appellees Everen Securities, Inc., and William Blair & Co., L.L.C.

Mayer, Brown & Platt, of Chicago (Alan N. Salpeter, Michele Odorizzi, and Jonathan C. Medow, of counsel), for appellee Deloitte & Touche.

Piper, Marbury, Rudnick & Wolfe, of Chicago (Lawrence A. Wojcik and Dennis J. Powers, of counsel), for appellee Altschuler, Melvoin & Glasser, L.L.P.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

In appeal number 1—01—0851, plaintiffs Raymond G. Scachitti, Patrick J. Houlihan and Robert F. Rifkin (Scachitti plaintiffs), residents and taxpayers of the City of Chicago (City), filed a lawsuit on behalf of the City against defendants Prudential Securities, Inc. (Prudential), Everen Securities, Inc. (Everen)[1], Deloitte & Touche (Deloitte), and

---

[1]Everen is the corporate successor to Kemper Securities Group, Inc. As Everen was named in the Scachitti complaint, and is one of the appellees, this opinion will refer to Everen, though the firm was known under the prior name during the time period at issue in this case.

Altschuler, Melvoin, and Glasser, L.L.P. (Altschuler), alleging that all of these defendants breached a fiduciary duty and breached a contract. The Scachitti plaintiffs' complaint also seeks recovery of allegedly fraudulently obtained public funds from Prudential and Everen, pursuant to Article XX of the Illinois Code of Civil Procedure (735 ILCS 5/20—101 *et seq.* (West 1998)) (Code). The Scachitti complaint further accuses Prudential and Everen of committing common-law fraud, and Deloitte and Altschuler of malpractice. The Scachitti plaintiffs appeal orders of the circuit court of Cook County dismissing the claim of breach of fiduciary duty for failing to state a claim pursuant to section 2—615 of the Code (735 ILCS 5/2—615 (West 1998)), and dismissing the remaining claims as time-barred, pursuant to section 2—619 of the Code (735 ILCS 5/2—619(a)(5) (West 1998)).

In appeal number 1—01—2111, plaintiff Adriana DiPaolo, a resident and taxpayer of the County of Du Page (County), filed a lawsuit on behalf of the County, making substantially similar claims against William Blair & Co., L.L.C. (Blair), and Jerry L. Lacy. DiPaolo appeals orders of the circuit court of Cook County with respect to Blair, dismissing the claim of breach of fiduciary duty for failing to state a claim, dismissing the Article XX and common-law fraud claims as not alleging the type of injury that those claims could redress, finding that all of the claims against Blair were time-barred, and finding no just reason to delay enforcement or appeal of the dismissal as to Blair.[2] The cases were consolidated on appeal. As a convenience, this opinion refers to Everen, Prudential and Blair collectively as the Underwriter defendants, and to Deloitte and Altschuler collectively as the Accountant defendants.

The record on appeal discloses that both complaints were filed in the trial court on April 3, 2000, and assigned to different judges. Both complaints generally allege that in order to finance public projects, such as roads, schools, hospitals, bridges and the like, local governments borrow money by issuing bonds to investors. Plaintiffs also alleged that, to assist local governments in such efforts, federal law generally exempts interest on such bonds from federal income taxation.

Plaintiffs alleged that the City and County were victims of a practice sometimes called "yield-burning" by underwriters and accountants who handled various aspects of advance-refunding transactions in 1992 and 1993. Plaintiffs' complaints discuss the mechanics of

---

[2]According to the plaintiffs, Lacy, whose place of business was allegedly in Arizona, apparently could not be located and served. The record shows that the dismissal orders did not apply to Lacy, who is not a party to this appeal.

advance-refunding transactions and "yield-burning" at some length. An advance-refunding transaction can result in substantial debt-service savings to issuers in a declining interest-rate environment. Such transactions may be used where the original local governmental bonds paying a high rate of interest cannot be redeemed prior to a specified "call" date in the future.

In an advance-refunding transaction, new local governmental bonds are issued and the proceeds are used to purchase open market securities which are similar or identical to the original bonds in terms of the interest, principal and call date. The open market securities, generally United States Treasury obligations, are held in an irrevocable escrow account. This account, also called a defeasance escrow, must be fully invested throughout the defeasance period and used only to pay the interest, principal and redemption premium, if any, on the original refunded bonds.

Plaintiffs allege that federal law does not permit a local governmental issuer to profit from the investment of the proceeds of tax-exempt bonds. Accordingly, plaintiffs allege, federal law restricts the overall yield that local governments can earn on securities placed in a defeasance escrow. If a municipal issuer invests the defeasance escrow in securities that earn a higher yield than that paid to the holders of the advance-refunding bonds, a positive arbitrage would be created; profits from such arbitrage would be required to be paid to the United States Treasury at the risk of losing the tax-exempt status of the advance-refunding bonds.

Generally, a municipal issuer must certify that the yield restriction was materially satisfied, along with a statement of the factual basis for the certification. Plaintiffs allege that for advance-refunding bonds, the investment rate of the proceeds cannot exceed the borrowing rate by more than one thousandth of a percentage point. A municipal issuer may satisfy the yield restriction by investing in special State and Local Government Series Bonds (SLGS) from the United States Treasury at or below the restricted rate. Alternatively, a municipal issuer may invest in a portfolio comprised of higher yielding open-market securities and zero-interest SLGS that produces a yield at or below the restricted rate.

"Yield-burning" may occur where a securities dealer overcharges an issuer for bonds. Because a bond's yield rate moves inversely to the price of the principal, an overcharge decreases the effective yield of the instrument. This practice, colloquially known as "burning" the yield, may also enhance the profits of firms that construct such portfolios for municipal issuers. However, it seems undisputed that United States Treasury regulations require defeasance escrow investments to be priced at fair market value, in order to prevent arbitrage.

The Scachitti complaint alleged that in March 1992, the City issued a $48,070,000 advance-refunding bond series (1992 City Refunding Bonds) to retire an outstanding 1987 bond issue, on which the City was obligated to pay a higher interest rate than on the 1992 rates. However, the 1987 issue could not be redeemed until January of 1997, so the proceeds from the sale of the 1992 City Refunding Bonds were used to purchase United States Treasury Bonds to be held in a defeasance escrow account, which would be used to pay principal and interest, and to redeem the 1987 bonds in 1997.

The Scachitti complaint avers that Everen served as the lead underwriter for the 1992 City Refunding Bonds. Everen was allegedly hired by negotiation, rather than by competitive bidding. Everen allegedly sold the City United States Treasury Bonds that were held in a defeasance escrow. The Scachitti complaint further alleged that Everen provided various advisory services to the City that rendered Everen an investment adviser to the City, and that a confidential relationship existed between the two, in which the City placed trust and reliance in Everen.

The Scachitti complaint also alleged that the City retained Deloitte to verify the mathematical accuracy of Everen's yield computations. Plaintiffs allege that Deloitte should have verified the yields according to the fair market value of the escrow securities, and by failing to do so, understated the true yield of the escrow securities, thereby creating a positive arbitrage. The Scachitti complaint alleges that this knowing oversight permitted Everen to conceal an excessive markup on the bonds and burn the yield by $221,697.06.

Similarly, the Scachitti complaint alleges that in March 1993, the City issued a $232,880,000 advance-refunding bond series (1993 City Refunding Bonds) to retire prior outstanding issues. In this transaction, Prudential served as the lead underwriter and is alleged to be in a fiduciary relationship with the City. Like Deloitte, the accounting firm of Altschuler was retained to verify the mathematical accuracy of Prudential's yield computations. The Scachitti complaint avers that Altschuler should have used the fair market value of the securities in verifying the yield computations, and by knowingly failing to do so, allowed Prudential to conceal $516,554.63 in yield-burned markups.

The DiPaolo complaint alleges that in April 1993, the County issued a $161,590,000 advance-refunding bond series (1993 County Refunding Bonds) to retire prior outstanding issues from 1987 and 1991. In this transaction, Blair served as the lead underwriter and is alleged to be in a fiduciary relationship with the County. Lacy was retained to verify the mathematical accuracy of Blair's yield computations. The DiPaolo complaint claims that Lacy should have used the

fair market value of the securities in verifying the yield computations, and by knowingly failing to do so, allowed Blair to conceal at least $707,747 in yield-burned markups.

In both cases, the defendants filed combined motions to dismiss pursuant to section 2—619.1 of the Code (735 ILCS 5/2—619.1 (West 2000)). The arguments raised by the defendants were substantially similar in a number of respects. The motions argued that the Underwriter defendants did not have a fiduciary relationship with the City or the County; the complaints failed to identify the terms of the contracts allegedly breached; and that the City and the County suffered no damages. The motions also argued that the claims against the Underwriter defendants were barred by a five-year statute of repose found in section 13(D) of the Illinois Securities Law of 1953 (815 ILCS 5/13(D) (West 1992)), and that the claims against the Accountant defendants were barred by the five-year statute of repose for actions brought against public accountants (735 ILCS 5/13—214.2(b) (West 1992)).

In addition, Prudential argued that the Scachitti complaint's claims against it were barred by a settlement agreement in *United States ex rel. Lissack v. Prudential Securities, Inc.*, 95 Civ. 1363, a suit brought pursuant to the federal False Claims Act (31 U.S.C. § 3729 *et seq.* (1994)) in the Federal District Court for the Southern District of New York, involving a number of municipal advance-refunding transactions across the country, including the 1993 City Refunding Bonds. The settlement agreement provided in part that the Internal Revenue Service (IRS) would consider the United States Treasury obligations sold in the transactions listed therein to have been sold at fair market value.

The plaintiffs responded to the various motions to dismiss, arguing in part that the statutes of limitations and repose could not be asserted against the City or County in the performance of public acts under the doctrine of *nullum tempus occurrit regi* ("time does not run against the king"). The plaintiffs also argued that if a statute of limitations was applicable, the Article XX claims would be governed by section 13—205 of the Code (735 ILCS 5/13—205 (West 2000)) and the time for bringing them would be tolled due to fraudulent concealment; the complaints properly pleaded that the City and County suffered damages; and that the breach of contract and fiduciary duty claims were properly pleaded. In addition, the Scachitti plaintiffs argued that the City's interests were not represented in the settlement of the federal lawsuit.

On September 26, 2000, the trial court dismissed the DiPaolo complaint's claim of breach of fiduciary duty for failure to state a

claim. The trial court's order also dismissed the DiPaolo complaint's Article XX and common-law fraud claims on the ground that they did not allege the type of injury these claims could redress; the order granted DiPaolo leave to replead as to these latter claims. The transcript of proceedings shows that the trial court also ruled that the *nullum tempus* doctrine did not insulate the DiPaolo complaint against a statute of limitations, which the trial court determined to be section 13—205 of the Code.

On January 31, 2001, the trial court issued a memorandum and opinion as to the Scachitti complaint. The order states that the trial court had previously ruled during hearings on the motions to dismiss that: the *nullum tempus* doctrine did not apply to the claims at issue; the five-year statute of repose found in section 13(D) of the Illinois Securities Law could not be tolled by allegations of fraudulent concealment; the motion to dismiss claims of breach of fiduciary duty for failure to state a claim was granted as to all defendants; and Accountant defendants' motions to dismiss based on the five-year statute of repose for actions brought against public accountants was granted. The order then discussed section 13(D) of the Illinois Securities Law, concluding that it applied to and barred the Article XX and breach of contract claims.

On May 10, 2001, after DiPaolo amended her complaint, the trial court entered an order ruling that the claims against Blair were barred by section 13(D) of the Illinois Securities Law and finding no just reason to delay enforcement or appeal of the dismissal as to Blair. The plaintiffs filed notices of appeal to this court, which consolidated the cases for appeal.

## I

■ The issue on appeal in both cases is whether the trial court erred in dismissing plaintiffs' complaints. The complaints were dismissed pursuant to section 2—619 of the Illinois Code of Civil Procedure, which provides a means of obtaining summary disposition of issues of law or easily proved issues of fact. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115, 619 N.E.2d 732, 735 (1993). Section 2—619(a)(5) provides that an action may dismissed where it "was not commenced within the time authorized by law." 735 ILCS 5/2—619(a)(5) (West 2000). A section 2—619 motion to dismiss admits the legal sufficiency of the plaintiffs' cause of action, much as a section 2—615 motion to dismiss admits a complaint's well-pleaded facts. See *Kedzie*, 156 Ill. 2d at 115, 619 N.E.2d at 735. Section 2—619 dismissals are reviewed *de novo*. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344, 736 N.E.2d 145, 150 (2000).

## II

■ Plaintiffs initially contend that the trial courts erred in ruling that the *nullum tempus* doctrine did not apply to these cases. The plaintiffs argue that the *nullum tempus* doctrine exempts the state from the operation of a statute of limitations, unless by its terms the statute expressly includes the state, county, municipality, or other governmental agency. *Clare v. Bell*, 378 Ill. 128, 130-31, 37 N.E.2d 812, 814 (1941). Historically, the *nullum tempus* doctrine emerged from concepts of sovereign power and prerogative; following the abolition of sovereign immunity in the Illinois Constitution of 1970, the doctrine is supported by policy judgments that the public should not suffer as a result of the negligence of its officers and agents in failing to promptly assert causes of action which belong to the public. See *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 472, 546 N.E.2d 580, 600-01 (1989); *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill. 2d 457, 461, 451 N.E.2d 874, 876 (1983).

The test is whether the right that plaintiff governmental unit seeks to assert "is in fact a right belonging to the general public, or whether it belongs only to the government or to some small and distinct subsection of the public at large." *Shelbyville*, 96 Ill. 2d at 462, 451 N.E.2d at 876-77; see, *e.g.*, *Winakor v. Annunzio*, 409 Ill. 236, 249, 99 N.E.2d 191 (1951) (belated change of variable contribution rate by Department of Labor permitted because it was in aid of the public purpose of relieving unemployment); *Clare*, 378 Ill. at 130-32, 37 N.E.2d at 814 (action to collect penalties on delinquent property taxes allowed to proceed because the right to collect them was "public"); *People ex rel. City of Chicago v. Commercial Union Fire Insurance Co.*, 322 Ill. 326, 332-33, 153 N.E. 488, 491 (1926) (action to impose city license fee on a foreign fire insurance company held "public" because the proceeds would benefit city's fire department); *Greenwood v. Town of La Salle*, 137 Ill. 225, 229, 26 N.E. 1089, 1090 (1891) (municipality's right to collect local property taxes ruled "public" because the "taxes may be levied for purposes in which the public, generally, are directly interested, such as 'constructing or repairing roads, bridges or causeways' within the town [citations]"). Specifically, our supreme court has focused on "the effects of the interest on the public, the governmental entities [*sic*] obligation to act on behalf of the public and the extent to which public funds must be expended." *A, C & S, Inc.*, 131 Ill. 2d at 476, 546 N.E.2d at 602.

In this case, defendants rely heavily on *Champaign County Forest Preserve District v. King*, 291 Ill. App. 3d 197, 683 N.E.2d 980 (1997), which affirmed the dismissal of a claim by the Champaign County Forest Preserve District (District) seeking to recover alleged overcharges

for insurance premiums totaling $140,000. The *King* court concluded that the purchase of liability insurance had no effect on the public at large, as it did not make the public safer or reduce the likelihood of injury on the District's property. *King*, 291 Ill. App. 3d at 201, 683 N.E.2d at 983. The *King* court noted that the District was legally required to indemnify and protect its commissioners and employees against various claims and suits, but was not legally required to purchase insurance, which was only one of several alternatives the District could have chosen as protection against claims and suits. *King*, 291 Ill. App. 3d at 201-02, 683 N.E.2d at 983. The court then stated that the fact that public funds were used to purchase insurance does not necessarily render it a public act; otherwise, any use of public funds would always be considered a public act. *King*, 291 Ill. App. 3d at 202, 683 N.E.2d at 983.

The transactions at issue in the cases on appeal do not involve the purchase of liability insurance. Thus, *King* seems no more or less useful in deciding these cases than the cases which *King* cites, *e.g.*, *Shelbyville* and *A, C & S, Inc.* Accordingly, this court will apply the principles announced by our supreme court to the transactions here without giving undue weight to *King*.

## A

The question of who would benefit by the government's action and who would lose by its inaction is of "paramount importance" in our analysis. *Shelbyville*, 96 Ill. 2d at 462, 451 N.E.2d at 877. The defendants characterize plaintiffs' acts as "the forays of the City and the County into the markets to buy U.S. Treasury securities." However, in *A, C & S, Inc.*, our supreme court *rejected* the argument "that in determining whether a governmental entity is pursuing a public interest, review should be made of the nature of the transaction and not the consequences flowing from the transaction." *A, C & S, Inc.*, 131 Ill. 2d at 475, 546 N.E.2d at 602.

Plaintiffs argue that the advance-refunding transactions should be deemed a public act because the City and County ordinances authorizing these transactions generally state that they are being undertaken for a public purpose and in the public interest. In *Shelbyville*, the court stated that it did *not* "find any logic in allowing the designation of the city's action as 'public' or 'private' to be controlled by the origin of the city's rights in a private contract or local ordinance." *Shelbyville*, 96 Ill. 2d at 465-66, 451 N.E.2d at 878. The *A, C & S, Inc.* court performed its own analysis of the issue, but also found support for its ruling that a public right was involved in the state Asbestos Abatement Act (Ill. Rev. Stat. 1985, ch. 122, par. 1401 *et seq.*). *A, C & S, Inc.*, 131 Ill. 2d at 475, 546 N.E.2d at 602.

Plaintiffs argue that in this case, "the underlying activities being financed—providing a jail, a courthouse, and a storm water system—are all important public functions." Defendants have not disputed this, but respond that examining the public purposes for which the plaintiffs originally issued the bonds is a diversion from the question of whether the advance-refunding transactions benefit the public. Defendants argue that the public already received the benefit of the underlying activities in the original bond issue and that *King* takes great pains to emphasize that a benefit to overall public finances is insufficient to establish a public right.

None of the parties has cited case law specifically addressing the question of whether benefit of the underlying activities in the original bond issue should be considered when analyzing whether the advance-refunding of those bonds benefits the public. Our supreme court has stated that "[t]he issuance of refunding and funding bonds does not create additional indebtedness but merely evidences existing debts." *Kocsis v. Chicago Park District*, 362 Ill. 24, 35, 198 N.E. 847, 853 (1935); see also *People ex rel. City of Rock Island v. Rudgren*, 378 Ill. 408, 413, 38 N.E.2d 723, 726 (1941) (power to issue refunding bonds is implied in statute authorizing issuance of bonds to construct a bridge). In these cases, the transactions were designed to substitute lower-interest debt for the original high-interest debt financing public projects. Accordingly, the advance-refunding transactions should not be considered separately from the original bonds and, by extension, the purpose for which they were issued.

Contrary to defendants' argument, *King* does not emphasize that a benefit to public finances does not create a public act. The *King* court *did* state that "the fact that public funds were used to purchase insurance does not necessarily render it a public act." *King*, 291 Ill. App. 3d at 202, 683 N.E.2d at 983. However, the *King* court stated this in analyzing the *third* factor extracted from *Shelbyville*, not the first factor. It cannot be doubted that the third "prong of *Shelbyville* must be given a realistic application." *A, C & S, Inc.*, 131 Ill. 2d at 476, 546 N.E.2d at 602. However, defendants have cited no authority stating that the analysis of the third prong may be imported into the analysis of the first prong.

The *King* court *did* consider, as a separate matter, whether the District asserted a public right in filing a lawsuit against defendants for excessive insurance premiums. *King*, 291 Ill. App. 3d at 202-04, 683 N.E.2d at 984-85. The *King* court concluded that such a suit did not assert a public right, despite the alleged loss of tax revenue, as the expenditure of funds did not serve a public purpose, such as increasing public safety. *King*, 291 Ill. App. 3d at 203-04, 683 N.E.2d at 984-85.

The *King* court thus distinguished *A, C & S, Inc.*, as involving not only a loss of tax revenue, but a threat to public health. *King*, 291 Ill. App. 3d at 203, 683 N.E.2d at 984.

■ As noted above, Illinois law treats refunding bonds, and the power to issue such bonds, as related to the original debt, and the power to incur said debt. Moreover, the Illinois Constitution of 1970 recognizes that certain powers are generally considered essential to government, *i.e.*, to regulate for public welfare, to license, to tax and to incur debt. See *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537, 539-40, 338 N.E.2d 15, 17 (1975) (and authorities cited therein). A review of *nullum tempus* cases shows that our supreme court generally holds that *nullum tempus* may be invoked by a local government when the suit relates to these essential powers of government. The police power was implicated in *A, C & S, Inc.*, *Shelbyville* and *Winakor*; the taxing power was implicated in *Greenwood* and *Clare*; the licensing and taxing powers were implicated in *Commercial Union Fire Insurance Co.* This case involves the essential power to incur debt.

Furthermore, as long ago as the nineteenth century, our supreme court stated in *Greenwood* that it "entertained no doubt" that a municipality's right to collect a property tax was a public right because the "taxes *may* be levied for purposes in which the public, generally, are directly interested, such as 'constructing or repairing roads, bridges or causeways' within the town. [Citations.]" (Emphasis added.) *Greenwood*, 137 Ill. at 228-29, 26 N.E. at 1089-90. Our supreme court did not *require* the local government to show that sums so collected would be applied to those purposes. This case is stronger than *Greenwood*, as the alleged overcharges relate to debts already incurred, and defendants have not disputed that the original debts were incurred for the benefit of the general public.

Defendants also cite *People ex rel. Town of New Trier v. Hale*, 320 Ill. App. 645, 52 N.E.2d 308 (1943), in which a relator sued Hale and various sureties on bonds given by him as town collector of the Town of New Trier, alleging that Hale retained commissions on collections as compensation in excess of that permitted by statute. This court held that the rights in controversy concerned the Town of New Trier only, not the public at large. *Hale*, 320 Ill. App. at 652, 52 N.E.2d at 311. Defendants cite *Hale* as rejecting a claim that a local government can invoke *nullum tempus* to redress the skimming of public monies.

Defendants' reliance on *Hale* does not account for our supreme court's decision in *A, C & S, Inc.*, which rejected a similar argument based on *Brown v. Trustees of Schools*, 224 Ill. 184, 187-88, 79 N.E. 579, 580 (1906), one of the primary cases cited in *Hale*. *A, C & S, Inc.*, 131 Ill. 2d at 474-75, 546 N.E.2d at 602. The *A, C & S, Inc.* court did

so in part because multiple claims were involved. The consolidated cases here show that, unlike *Hale* or *King*, we are not confronted with an isolated claim. The *A, C & S, Inc.* court's rejection of this sort of argument was also based in part on the magnitude of the cost to be borne by the plaintiffs, which for the reasons discussed below, also favors the plaintiffs in this appeal.

█ The conclusion that a public right or act is implicated in these cases also finds support in state statutory law. The Local Government Debt Reform Act specifically authorized advance refunding of the sort at issue in these cases. Ill. Rev. Stat. 1991, ch. 17, par. 6911; see 30 ILCS 350/11 (West 2000). This authorization was granted in light of findings by the General Assembly that inconsistent and outdated provisions of Illinois law resulted in additional costs for the citizens of the State of Illinois residing in local governmental units because of the sale and issuance of bonds at higher rates than would otherwise be necessary, and it was in the best interests of said residents to provide supplemental authority regarding the issuance and sale of bonds to accommodate market practices and the provisions of current federal income tax law. Ill. Rev. Stat. 1991, ch. 17, par. 6902; see 30 ILCS 350/2 (West 2000). In addition, this case involves claims brought pursuant to Article XX of the Code, which reflects a determination by the General Assembly that the recovery of funds fraudulently obtained from a local government is in the public interest, even when a local government official declines to pursue such action. See 735 ILCS 5/20—101 *et seq.* (West 2000).

In sum, the advance-refunding transactions and suits to recover sums fraudulently obtained from the City and the County benefit the public.

## B

█ Plaintiffs argue that the City and County were obliged to act as they did by the language authorizing the advance-refunding transactions in the relevant City and County ordinances. However, the ordinances are acts of the plaintiffs themselves; cases such as *A, C & S, Inc.* refer to obligations imposed on local governments by state statutes. The home rule status of the City arguably might change the analysis as to the City, but such analysis would not apply to the County. Plaintiffs cite the Local Government Debt Reform Act, but that statute merely authorizes advance-refunding transactions; it does not require them. Plaintiffs' argument that the details of the transaction were largely governed by restrictions of federal law fails for the same reason, as federal law did not require the refunding transactions in the first instance. Plaintiffs claim that the underlying activities being financed

are all functions they are obliged to undertake, but the plaintiffs were not required to advance-refund them.

The question arises as to whether plaintiffs' failure to show that they were obliged to act precludes application of the *nullum tempus* doctrine. While *Shelbyville* and its progeny establish the factors to be considered, defendants have cited no authority holding that all of the factors or prongs must be satisfied for *nullum tempus* to apply. As the question of who benefits from the government's action is of paramount importance, it can be inferred that the factors are not equally important. Thus, plaintiffs' failure to show that they were obliged to act is not fatal.

## C

■ Plaintiffs contend that a "vast amount" of public revenue is being expended in their issuance and ultimate retirement of advance-refunding bonds. For example, plaintiffs note that the 1993 County Refunding Bonds alone were issued in the amount of $161,590,000, and claim that it will cost substantially more to retire those bonds. Defendants respond that the total debt service is not the proper measure of the public funds expended, as the purpose of the advance-refunding transaction is to reduce the ultimate expense to the plaintiffs.

Defendants also rely on *King*, in which the court relied in part on the lack of evidence indicating the total amount of money plaintiff paid for the insurance, and as to plaintiff's overall budget and whether the alleged overpayment amounted to a significant portion of the budget. *King*, 291 Ill. App. 3d at 202, 683 N.E.2d at 983-84.[3] An examination of the cost at issue in relation to a plaintiff's overall budget might be useful, but *King* appears to be the only case using that analysis. The *A, C & S, Inc.* court merely observed that "the cost of these abatement projects will run into the millions," without any mention, let alone analysis, of the overall budgets of the plaintiffs. *A, C & S, Inc.*, 131 Ill. 2d at 476, 546 N.E.2d at 602.

The *Shelbyville* court had been even more general, stating only that "the inability of the city of Shelbyville to enforce its annexation agreement or compel payment by the defendant will affect the city's finances." *Shelbyville*, 96 Ill. 2d at 464, 451 N.E.2d at 878. However, *A, C & S, Inc.* requires that this factor "be given a realistic application." *A, C & S, Inc.*, 131 Ill. 2d at 476, 546 N.E.2d at 602. Nevertheless, the *A, C & S, Inc.* court aggregated the cost of the asbestos abate-

---

[3]Defendants' reliance on *King* in this regard is somewhat contrary to their position that this court should not look at the total debt service.

ment projects to be borne by the plaintiff school districts. See *A, C & S, Inc.*, 131 Ill. 2d at 476, 546 N.E.2d at 602.

Harmonizing the case law, it appears that the relevant amount of public revenue being expended is that representing the potential damages to the plaintiffs. Accordingly, this court's analysis will be based on the amount of the overcharges, instead of the total debt service. However, the alleged overcharges also may be considered as an aggregate amount.

In this case, plaintiffs allege yield-burning occurred in the amounts of $221,697.06, $516,554.63, and at least $707,747, for a total of $1,445,998.69. This sum is approximately 10 times the alleged overcharges at issue in *King*, but less than the "millions" in costs potentially borne by the plaintiffs in *A, C & S, Inc.* However, the latter costs were to be borne by 34 school district plaintiffs, as opposed to the two plaintiffs here. See *A, C & S, Inc.*, 131 Ill. 2d at 436, 546 N.E.2d at 584. Thus, whether the potential damages are considered in the aggregate or by the amount alleged by each plaintiff, the third prong of the *Shelbyville* analysis is satisfied.

In sum, while the plaintiffs failed to show that they were legally required to engage in the advance-refunding transaction, their decision to do so, and their suits to recover the alleged overcharges, benefits the public and involves a magnitude of injury such that the *Shelbyville* test is satisfied for the application of the *nullum tempus* doctrine.

## D

■ Defendants assert in the alternative that plaintiffs cannot invoke the *nullum tempus* doctrine because they are *qui tam* relators, not the local governments themselves. This is apparently a question of first impression in Illinois. Plaintiffs rely on *Oklahoma ex rel. Schones v. Town of Canute*, 858 P.2d 436, 438-39 (Ok. 1993), which held that such plaintiffs could assert *nullum tempus* to the same extent as the government, had the government brought the case.

Defendants note that *Schones* was superceded by statute. The fact that *Schones* was superceded by statute does not mean that its rationale was incorrect. Both *nullum tempus* and *qui tam* serve the same general policy, which is to protect the public when public officials fail to pursue claims for the public benefit.

Defendants note that *qui tam* relators, unlike public officials, may be motivated by monetary gain. *Qui tam* is an abbreviation of *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which translates as "who as well for the king as for himself sues in this matter." Black's Law Dictionary 1262 (7th ed. 1999). *Qui tam* plaintiffs

are generally likened to private attorneys general. See *Lyons v. Ryan*, 324 Ill. App. 3d 1094, 1107-08, 756 N.E.2d 396, 406 (2001) (discussing relators under the federal False Claims Act). Defendants' argument is not an attack on the ability of *qui tam* relators to invoke *nullum tempus* as much as it is an attack on the *qui tam* concept itself. This court cannot ignore Article XX of the Code, which permits certain *qui tam* suits. Defendants have not shown that plaintiffs entitled to assert a government's claims are not entitled to assert its defenses or its responses to an opponent's defenses.

### E

Defendants argue that even if the plaintiffs may invoke the *nullum tempus* doctrine against statutes of limitations, they cannot invoke it against statutes of repose. Defendants argue that a statute of limitations is merely procedural, giving a time limit for bringing a cause of action beginning when the action has accrued, whereas a repose statute is substantive, extinguishing any right of bringing the cause of action, regardless of whether it has accrued. See *Highland v. Bracken*, 202 Ill. App. 3d 625, 632, 560 N.E.2d 406, 411 (1990). The Fourth District of this court rejected this same argument against *nullum tempus* in *People v. Asbestospray Corp.*, 247 Ill. App. 3d 258, 261-63, 616 N.E.2d 652, 654-55 (1993).

Defendants rely on *In re Estate of Bird*, 410 Ill. 390, 397, 102 N.E.2d 329, 333 (1951), in which the supreme court held that the time limitations in a nonclaim probate statute ran against the government. The *Asbestospray* court distinguished *Bird*, by stating that "[a] general statute of repose cannot be equated with the nonclaim probate statute enacted as part of a comprehensive probate code creating and circumscribing rights to claim against a decedent's estate and facilitating the expeditious administration of estates." *Asbestospray*, 247 Ill. App. 3d at 261, 616 N.E.2d at 654. The Underwriter defendants argue that section 13(D) of the Illinois Securities Law *is* part of a comprehensive scheme, making these cases more like *Bird* than *Asbestospray*.

The flaw in this argument is that *Bird* held that the nonclaim provision was *not* a statute that totally barred untimely claims. *Bird*, 410 Ill. at 394-97, 102 N.E.2d at 332-33. The *Bird* court noted that even if a claim was filed after the statutory period, it could be asserted against after-discovered assets, or heirs and distributees of the estate, or other security. *Bird*, 410 Ill. at 396-97, 102 N.E.2d at 333. In this case, the Underwriter defendants are attempting to assert the five-year statute of repose found in section 13(D) of the Illinois Securities Law (815 ILCS 5/13(D) (West 1992)), which may totally bar a variety of causes of action, even in cases where the plaintiff has not pleaded

them as arising under the Illinois Securities Law. See, *e.g.*, *Tregenza v. Lehman Brothers, Inc.*, 287 Ill. App. 3d 108, 678 N.E.2d 14 (1997). The five-year statute of repose for actions brought against public accountants (735 ILCS 5/13—214.2(b) (West 1992)) asserted by the Accountant defendants similarly acts as a total bar to suit.[4] The nature of these statutes distinguishes this case from *Bird*.

In sum, the trial courts erred in dismissing the complaints as barred by the repose statutes.

### III

The question remains as to whether the dismissals may be sustained on some other basis appearing on the face of the record. A reviewing court generally looks at the judgment itself in deciding whether to reverse it, not at the trial court's reasoning for its judgment. *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12 (1983).

### A

■ In these cases, plaintiffs are suing on behalf of the City and County pursuant to section 20—104(b) of the Code, which authorizes citizen lawsuits to recover compensation, benefits or remuneration, treble damages, fines, costs and litigation expenses, where certain threshold criteria are met. See 735 ILCS 5/20—104(b) (West 2000). Plaintiffs' complaints also assert common law claims of fraud, breach of contract and fiduciary duty and accountant malpractice, claiming "common law derivative standing [as] taxpayers to bring an action for a public entity to recover or enjoin a misuse of public funds."

Lack of standing may be raised as a basis for dismissal under section 2—619. *Glisson v. City of Marion*, 188 Ill. 2d 211, 220, 720 N.E.2d 1034, 1039 (1999). Our supreme court has held that a taxpayer may maintain a suit in equity to enjoin the misappropriation or waste of public funds by public officials. *E.g.*, *Reid v. Smith*, 375 Ill. 147, 149, 30 N.E.2d 908, 910 (1940). Our supreme court also has held that a constructive trust may be imposed against third parties that benefit from a public officer's breach of his or her fiduciary duty. *People ex rel. Daley v. Warren Motors, Inc.*, 114 Ill. 2d 305, 315, 500 N.E.2d 22, 26 (1986).

---

[4]Moreover, the statute of repose for actions against public accountants is not part of a comprehensive statutory scheme of the sort mentioned in *Asbestospray*. We also note that the Accountant defendants moved to strike a portion of plaintiffs' reply brief that challenged the trial courts' rulings that the five-year statute of repose for actions brought against public accountants applied in these cases. This court now denies that motion, the disposition of which does not affect the reasoning in this opinion.

In these cases, however, plaintiffs' complaints allege no breach of duty *by a public officer*. To the contrary, plaintiffs' complaints cast the City and the County as the unknowing victims of private third parties. Plaintiffs do not allege that these private third parties benefitted from a public officer's breach of duty. In sum, plaintiffs' complaints do not contain allegations that support their assertion of common law taxpayer derivative standing to pursue common law claims of fraud, breach of contract and fiduciary duty and accountant malpractice.[5]

## B

■■■ Defendants argue that plaintiffs have failed to show they have standing because they cannot show injury. Defendants rely on *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93, 524 N.E.2d 561, 575 (1988), which generally held that a plaintiff must claim an injury, whether actual or threatened, that is: (1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief. Defendants argue that because "[p]laintiffs concede that any overcharge would have to be paid to the IRS," the City and County were not injured.

Defendants cite paragraph 82 of the Scachitti complaint for the purported "concession." Although not cited by defendants, similar language appears in paragraph 76 of the DiPaolo complaint. A reading of both paragraphs shows that plaintiffs alleged that the markups on the United States Treasury securities pocketed by the Underwriter defendants should not have existed, but if it did exist, belonged to the City and County who were responsible for turning a markup over to the Internal Revenue Service (IRS) to avoid having the refunding bonds deemed taxable.

In these cases, assuming the allegations of the complaints to be true, as this court must in reviewing a dismissal, the Underwriter defendants fraudulently overcharged the City and County for United States Treasury securities by approximately $1,445,998.69. Such allegations clearly meet the criteria set forth in *Greer*. The possibility that the City or County may be or may have been required to pay these funds to the IRS would not defeat this argument, but would support it. The Underwriters cannot argue that the City or County may be required to pay the IRS funds out of their coffers, while the Underwriters retain the alleged overcharges.

---

[5]Plaintiffs also conceded at oral argument that they waived their claim of breach of fiduciary duty against the accountant defendants by failing to address it in their appellate brief.

## C

■ Finally, Prudential argues that the claims against it are barred by its settlement in the federal lawsuit. Paragraph 6(b) of the settlement agreement among Prudential, the United States and the IRS provides in part that upon receipt of the settlement amount, the IRS would consider the United States Treasury obligations sold in connection with government securities sales specified in an addendum to the agreement to have been sold at fair market value. The 1993 City Refunding Bonds are listed in that addendum. In paragraph 7(b), the IRS agreed that it would not impose any tax, penalty, adjustment or addition against any of the issuers with respect to the sales listed in the addendum. In paragraph 13 of the agreement, the IRS further agreed that while the settlement agreement shall be construed as being for the benefit of the parties thereto, the issuers and holders of said bonds shall be entitled to enjoin the IRS from taking action inconsistent with the agreement. Paragraph 14 of the agreement states in part that nothing in the agreement should be treated as indicating a determination by the IRS that any bond issue was or is exempt under the provisions of sections 103 and 141—150 of the code, except that the relevant sales of the United States Treasury obligations shall have no effect on the tax exempt status of the bonds listed in an addendum to the agreement which includes the 1993 City Refunding Bonds.

Prudential argues that the settlement agreement bars the claims against it because the City is no longer threatened with the loss of tax-exempt status for the 1993 City Refunding Bonds. The cases cited by Prudential are readily distinguishable on their facts from the cases now on appeal. See *Dixon v. Chicago & North Western Transportation Co.*, 151 Ill. 2d 108, 115-17, 601 N.E.2d 704, 707-08 (1992); *Wheatley v. Board of Education of Township High School District 205*, 99 Ill. 2d 481, 484-85, 459 N.E.2d 1364, 1366 (1984); *First National Bank of Waukegan v. Kusper*, 98 Ill. 2d 226, 233, 456 N.E.2d 7, 9 (1983); *People ex rel. Newdelman v. Weaver*, 50 Ill. 2d 237, 241, 278 N.E.2d 81, 83 (1972). However, these cases are based on the general rule that an issue is moot if no actual controversy exists or where events occur which make it impossible for the court to grant effectual relief. *E.g., Dixon*, 151 Ill. 2d at 116, 601 N.E.2d at 708. The question is whether this rule applies to the cases on appeal.

Prudential argues that its settlement with the United States and the IRS renders the claims against Prudential moot, because the Scachitti complaint is "wholly based on an IRS rule, and the IRS has now

found no violation of that rule." However, the terms of the settlement agreement, as summarized above, while protecting the City from adverse action by the IRS, do not require the conclusion that the IRS found no violation of the fair market value rule. Moreover, the allegations of the Scachitti complaint are not wholly based on alleged federal tax law violations. Paragraph 119 of the Scachitti complaint alleges in part that the markups charged by Prudential also were grossly excessive and unreasonable in light of prevailing market rates, as measured against markups on the winning offer in municipal bond refunding transactions where dealers competed to sell Treasury securities to an escrow. While the Scachitti complaint also alleges that Prudential was hired by negotiation, rather than by competitive bidding, taking the allegations to be true, and drawing all inferences favorable to the plaintiffs, this court cannot conclude that the typical markup in a competitive bidding setting is an improper measure of fair market value. Nor have the parties discussed the specific terms of the negotiated hiring of Prudential relating to amounts that could be retained by Prudential in return for its services.[6]

For all of the aforementioned reasons, the orders of the circuit court of Cook County are affirmed, except for the dismissal counts I and II of each complaint, which are brought against the Underwriter defendants pursuant to Article XX of the Code. The dismissal of counts

---

[6]After oral argument in these cases, Everen and Blair filed a "Joint Motion to Advise the Court of Recent Federal Settlements." Attached to the motion is a settlement among First Union Securities (the successor to Everen), the United States and the IRS, in the federal False Claims Act lawsuit. The relevant language of this settlement agreement is substantially similar to the Prudential settlement. Also attached to the motion is an agreement between the IRS and Blair. The language of this agreement is not substantially similar to the other settlements, particularly insofar as it does not expressly state that the issuers may assert the agreement as against the IRS, though paragraphs 3 and 9 may make the issuers intended third-party beneficiaries.

Objections were filed to the joint motion. A motion to file a reply brief was filed in response to the objections. This court grants the joint motion over objection, and denies the motion to file a reply. However, the settlements are no more helpful to Everen and Blair than the settlement raised by Prudential. We also note that paragraph 77 of the DiPaolo complaint alleges that the markups charged by Blair also were grossly excessive and unreasonable in light of prevailing market rates. Accordingly, the settlements attached to the joint motion do not support dismissals in this case, for the same reasons discussed in the main body of this opinion regarding Prudential.

I and II of each complaint are reversed and the cases are remanded to the circuit court for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

QUINN and REID, JJ., concur.